## LOGAN *v.* UNITED STATES.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF TEXAS.

No. 1235. Argued January 26, 27, 1892. — Decided April 4, 1892.

A citizen of the United States, in the custody of a United States marshal under a lawful commitment to answer for an offence against the United States, has the right to be protected by the United States against lawless violence; this right is a right secured to him by the Constitution and laws of the United States; and a conspiracy to injure or oppress him in its free exercise or enjoyment is punishable under section 5508 of the Revised Statutes.

The consolidation, under section 1024 of the Revised Statutes, of several indictments against different persons for one conspiracy, if not excepted to at the time, cannot be objected to after verdict.

An act of Congress, requiring courts to be held at three places in a judicial district, and prosecutions for offences committed in certain counties to be tried, and writs and recognizances to be returned, at each place, does not affect the power of the grand jury, sitting at either place, to present indictments for offences committed anywhere within the district.

A jury in a capital case, who, after considering their verdict for forty hours, have announced in open court that they are unable to agree, may be discharged by the court of its own motion and at its discretion, and the defendant be put on trial by another jury.

Statement of the Case.

A juror summoned in a capital case, who states on *voir dire* that he has conscientious scruples in regard to the infliction of the death penalty for crime, may be challenged by the government for cause.

The provision of section 858 of the Revised Statutes, that " the laws of the State in which the court is held shall be the rules of decision as to the competency of witnesses in the courts of the United States in trials at common law, and in equity and admiralty," has no application to criminal trials.

Unless by express statute, the competency of a witness to testify in one State is not affected by his conviction and sentence for felony in another State.

A pardon of a convict, although granted after he has served out his sentence, restores his competency to testify to any facts within his knowledge.

Under section 1033 of the Revised Statutes, any person indicted of a capital offence has the right to have delivered to him, at least two days before the trial, a list of the witnesses to be produced on the trial for proving the indictment; and if he seasonably claims this right, it is error to put him on trial, and to allow witnesses to testify against him, without having previously delivered to him such a list; and, *it seems*, that the error is not cured by his acquittal of the capital offence, and conviction of a lesser offence charged in the same indictment.

Upon an indictment for conspiracy, acts or declarations of one conspirator, made after the conspiracy has ended, or not in furtherance of the conspiracy, are not admissible in evidence against the other conspirators.

Four indictments, numbered in the record 33, 34, 35 and 36, on sections 5508 and 5509 of the Revised Statutes (copied in the margin [1]) were returned by the grand jury at January term,

---

[1] " SEC. 5508. If two or more persons conspire to injure, oppress, threaten or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or if two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured; they shall be fined not more than five thousand dollars and imprisoned not more than ten years, and shall, moreover, be thereafter ineligible to any office or place of honor, profit or trust, created by the Constitution or laws of the United States.

" SEC. 5509. If in the act of violating any provision in either of the two preceding sections any other felony or misdemeanor be committed, the offender shall be punished for the same with such punishment as is attached to such felony or misdemeanor by the laws of the State in which the offence is committed."

By the laws of Texas, killing with malice aforethought, either express or implied, is murder; murder committed with express malice is murder in

1890, of the District Court for the Northern District of Texas, sitting at Dallas in that district, against Eugene Logan, William Williams, Verna Wilkerson and Clinton Rutherford, for conspiracy to injure and oppress citizens of the United States in the free exercise of a right secured to them by the Constitution and laws of the United States, and for murder committed in the prosecution of the conspiracy; and were forthwith transmitted to the Circuit Court.

Indictment 34 averred, in the first count, that on January 19, 1889, at Graham in the county of Young and that district, Charles Marlow, Epp Marlow, Alfred Marlow, George W. Marlow, William D. Burkhart and Louis Clift were citizens of the United States, and in the power, custody and control of Edward W. Johnson, a deputy United States marshal for that district, by virtue of writs of commitment from a commissioner of the Circuit Court of the United States for the district, in default of bail, to answer to indictments for an offence against the laws of the United States, to wit, larceny in the Indian country, within the exclusive jurisdiction of the United States; and that while said Johnson held them in his power, custody and control, in pursuance of said writs, the defendants, "together with divers other evil-disposed persons, whose names to the grand jurors aforesaid are unknown, did then and there combine, conspire and confederate by and between themselves, with force and arms, to injure and oppress them, the said Charles Marlow, Epp Marlow, Alfred Marlow, George W. Marlow, William D. Burkhart and Louis Clift, then and there citizens of the United States of America, in the free exercise and enjoyment of a right, and because they were then and there exercising and enjoying said right, then and there secured to them" "by the Constitution and laws of the United States, to wit, the right to then and there be protected by said deputy United States marshal from the assault of" the defendants and other evil-disposed persons, "and the right then and

the first degree; the punishment of murder in the first degree is death, or imprisonment in the penitentiary for life; and the degree of murder, as well as the punishment, is to be found by the jury. Texas Penal Code of 1879, arts. 605, 606, 607, 609.

there to be held in the power, custody and control of said deputy United States marshal under and by virtue of said writs heretofore set forth, and the further right, while in said custody, to be secure in their persons from bodily harm and injury and assaults and cruelties until they" "had been discharged by due process of the laws of the United States;" and that the defendants, in pursuance of such combination and conspiracy, and in the prosecution thereof, on January 19, 1889, and in the night time, went upon the highway in disguise, and way-laid and assaulted the said prisoners, while in the power, custody and control of said deputy United States marshal, with loaded shotguns, revolvers and Winchester rifles, and, in pursuance and prosecution of the conspiracy, feloniously, wilfully and of their malice aforethought, and from a deliberate and premeditated design to effect his death, did with those weapons kill and murder Epp Marlow, then and there in the peace of the United States being; (charging the murder in due technical form;) "contrary to the form of the statute in such case made and provided, and against the peace and dignity of the United States of America."

The other counts in this indictment were substantially similar, except that some of them alleged the prisoners to have been in the custody of Thomas Collier, sheriff and jailer of Young County, under the writs of commitment from the United States commissioner; or alleged Alfred Marlow to have been the person murdered; or charged one of the defendants as principal and the others as accessories in the murder.

Indictments 33 and 36 were substantially like 34. Indictment 35 added John Levell and Phlete A. Martin as defendants, and (besides counts like those in the other indictments, omitting, however, the charge of murder) contained counts alleging a conspiracy to obstruct the deputy marshal and the jailer in the execution of the writs of commitment, and in pursuance thereof, an attempt to take the prisoners from the jail on January 17, and a murder of some of them on the highway on January 19, 1889.

Five other indictments had been returned by the grand jury in February and March, 1889, and transmitted to the Circuit

Court, against Logan, Martin and other persons, (some of whom were not the same as in the other four indictments,) containing charges, in various forms, like those in the added counts in indictment 35.

At October term, 1890, held at Graham, the following proceedings took place:

On October 21, 1890, the district attorney moved that the nine indictments be consolidated and be tried together, because they charged cognate and kindred crimes, and presented parts and phases of the same transaction. The defendants opposed the motion, because the indictments set forth offences of different grades, and were framed under different sections of the statutes, with different penalties and procedures. The motion was granted, and the indictments were all consolidated with No. 34, under the title "No. 34 consolidated;" and the defendants excepted.

On October 22, 1890, the defendants, " excepting to the several indictments presented against them, and by order of this court consolidated and now being prosecuted under case No. 34 on the docket of said court, charging said defendants with a conspiracy to injure and oppress Charles Marlow and others in the free exercise and enjoyment of rights secured to them by the Constitution and laws of the United States, move the court to quash said indictments and dismiss this prosecution, for the following reasons:

" 1st. The said indictments are found and presented by a grand jury at the January term of the United States District Court for the Northern District of Texas, holding session at Dallas; and the allegations of said indictments show that the offences therein charged were committed, if at all, in the subdivision of said district, offences committed in which are cognizable alone at the term of the District and Circuit Court to be held at Graham in said Young County; therefore this court is without jurisdiction.

" 2d. Said indictments charge these defendants with a conspiracy to injure and oppress Charles Marlow and others named in said indictments in the free exercise and enjoyment of their right secured to them by the Constitution and laws of the

United States, a right to be protected by a deputy marshal of the United States, in whose custody they were, under process of this court; and the said indictments are bad, because no such right as therein alleged is secured to said persons by the Constitution and laws of the United States; and therefore this court has no jurisdiction.

"3d. Said indictments charge no offence against the laws of the United States, or within the jurisdiction of this court; but show upon their face, by the allegations thereof, that the offence committed, if any, was against the laws of the State of Texas, of which the courts of said State have exclusive juris-. diction."

The court overruled the motion to quash the indictment, and the defendants excepted.

On October 30, 1890, the district attorney moved the court for an order to set aside the former order of consolidation, so far as to separate the five earlier indictments; to confirm the consolidation of indictments 33, 34, 35 and 36; to sever Levell and Martin from their co-defendants; and to order the consolidated case to stand for trial against Logan, Williams, Wilkerson and Rutherford. The court made an order accordingly, except that as to Williams the case was continued on his application, and with the consent of the district attorney. To this order no exception was taken by the defendants.

Logan, Wilkerson and Rutherford then severally pleaded not guilty, and a trial was had, resulting, on November 22, 1890, in this verdict: "We the jury find the defendant Clinton Rutherford not guilty. The jury cannot agree as to Eugene Logan and Verna Wilkerson." The court approved the verdict, and ordered it to be recorded; and also ordered that Rutherford be discharged from the indictment, and that Logan and Wilkerson stand committed to the custody of the marshal until further order.

At February term, 1891, held at Graham, the court, on motion of the district attorney, ordered to be consolidated with "No. 34 consolidated" an indictment, numbered 37, found by the grand jury in the District Court at Graham on October 29, 1890, and forthwith transmitted to the Circuit

Court, charging Collier, Johnson, Levell, Marion Wallace, Samuel Waggoner, William Hollis, Richard Cook and five others named, but not including Logan, with the same conspiracy, and in pursuance thereof with the attempt to kill on January 17, and the murder on January 19. No exception was taken to this order.

On motion of the district attorney, suggesting the deaths of Williams and Collier, the indictments were dismissed as to them.

The remaining defendants in indictment 37 "excepted to the several indictments" so consolidated, and made a motion to quash them, on the second and third grounds stated in the former motion to quash. This motion was overruled, and these defendants excepted to the overruling of the motion, and then pleaded not guilty.

Logan and Wilkerson filed a special plea that they had once been in jeopardy for the same offence, in this, that at October term, 1890, of the court they were tried upon the same indictment and for the same murder and conspiracy by a jury; "that said jury were legally drawn, empanelled and sworn, and after hearing the evidence, argument of counsel and charge of the court, retired to consider their verdict; that said jury were in their retirement about forty hours, when they announced in open court that they were unable to agree as to these defendants. Thereupon the court, of its own motion, and without the consent of these defendants or either of them, discharged said jury from further consideration of this case, and remanded these defendants to the custody of the United States marshal; all of which will more fully appear by reference to copies of said verdict and the order of the court entered thereon, which are hereto attached. These defendants further state that there existed in law or fact no emergency or hurry for the discharge of said jury, nor was said discharge demanded for the ends of public justice; and, for the purpose of this motion or special plea only, these defendants aver and charge that the Circuit Court of the United States for the Northern District of Texas, at Graham, at October term, 1890, had jurisdiction over and power to try and determine said

cause." Annexed to this plea were copies of the verdict and of the order of the court thereon, above stated.

To this plea the district attorney filed an exception in the nature of a demurrer. The court ordered the exception to be sustained, and the plea held for naught; and to this order Logan and Wilkerson excepted.

By order of the court, on motion of the district attorney, Johnson and five others in indictment 37 were severed from the other defendants, leaving the case to proceed against Logan, Wilkerson, Levell, Wallace, Waggoner, Hollis and Cook.

Copies of the indictments, having endorsed on each the names of the witnesses upon whose testimony it had been found by the grand jury, were delivered to the defendants therein more than two days before the trial. But no list of the witnesses to be produced at the trial for proving the indictment was delivered to any of the defendants. When the case was called for trial, and the government announced that it was ready, the defendants suggested these facts, and moved the court that they be not required to proceed further until such lists should be furnished them. The court overruled the motion, and the defendants excepted.

At the empanelling of the jury, the district attorney, by leave of the court, put to fourteen of the jurors summoned this question: " Have you any conscientious scruples in regard to the infliction of the death penalty for crime?" and each of them answered that he had such conscientious scruples, and was thereupon challenged for cause. To all this the defendants at the time objected, " because the jury in the United States court has nothing to do with the penalty, but passes alone upon the guilt or innocence of the defendants, and because it is not one of the disqualifications of jury service under the laws of the United States, and because the defendants were unlawfully deprived of the service of each of said jurors, who had been regularly drawn and summoned on the special venire heretofore issued herein as their triers in this cause." The court overruled all these objections, and the defendants excepted.

At the trial, forty witnesses, whose names were not endorsed on either indictment, were called and sworn to testify on behalf of the government. As to each and all of these witnesses the defendants objected to their testifying, because neither their names, nor a list containing their names, had been delivered to the defendants two days before the trial, and because the defendants had objected, on this ground, to proceeding when the case was called for trial. The court overruled the objection, and admitted these witnesses to testify to material facts necessary to prove the indictments and to make out the case for the government; and the defendants excepted.

Phlete A. Martin and one Spear, offered as witnesses by the government, were shown, by certified copies of the records produced and exhibited to them, to have been convicted and sentenced for felony. Martin was convicted, in the Superior Court of Iredell County in the State of North Carolina, of felonious homicide, and was sentenced in August, 1883, to imprisonment for six months in the county jail, and served out his sentence. Spear was convicted, in the District Court of Tarrant County in the State of Texas, of two larcenies, which were felonies by the law of Texas, and was sentenced in January, 1883, to two terms of imprisonment of two years each, and served out his sentence; and the government offered and read in evidence "a full proclamation of pardon" of those offences, issued to Spear by the Governor of Texas in May, 1889.

The defendants objected to each of these two witnesses testifying, "because under the laws of Texas they are incompetent to testify under and by virtue of an express statute, and because, the offences for which they were convicted being infamous crimes, they are incompetent to testify in the United States court held within the State of Texas;" and the defendants further objected to the proclamation of pardon issued by the Governor of Texas to Spear, "because said pardon was issued to him after he had served his full time required in said judgment and sentence, and because the facts about which he was called to testify came to his knowledge after said judgment of conviction and sentence and before the issue of said

proclamation of pardon, and because said proclamation of pardon cannot have the retroactive effect of rendering said witness competent to testify to facts which, when they came to his knowledge, he was incompetent to testify to."

The court overruled all these objections, and admitted the testimony of both witnesses to material facts; and afterwards instructed the jury that they were competent, and that the convictions and sentences affected their credibility only. The defendants excepted to the admission of this evidence, and to the instruction of the court thereon.

The government introduced evidence tending to prove the following facts:

Shortly before October term, 1888, of the District Court of the United States for the Northern District of Texas, held at Graham, the four Marlows named in the indictment, and one Boone Marlow, (the five being brothers,) were arrested on warrants issued by a commissioner of the Circuit Court of the United States on complaints charging them with larceny in the Indian Territory, within the exclusive jurisdiction of the United States; and at that term they were indicted for that offence, and enlarged on bail, and went to live on a farm in Young County, about twelve miles from Graham, known as the Denson Farm.

Afterwards, on December 17, 1888, the sheriff of the county and his deputy, Collier, went to the farm to arrest Boone Marlow on a capias from a court of the State to answer a charge of murder. Without showing their warrant, Collier fired a pistol at him, and he fired at Collier, and, missing him, killed the sheriff. The killing of the sheriff caused great excitement in Young County, and much resentment on the part of his friends against the Marlows. Boone Marlow escaped and did not appear again. The four other Marlows were put in the county jail by the citizens, and surrendered by their bail, and were again committed to the jail by Edward W. Johnson, a deputy United States marshal, under writs of commitment from the commissioner directing him to do so, to answer the indictments for larceny.

On the night of January 17, 1889, a body of men, armed

and partly disguised, entered the jail, surrounded the steel cage in which the four Marlows were confined, and attempted to enter it; but being resisted by the Marlows, and one of the mob knocked down and injured, they finally withdrew without doing any actual violence to the prisoners.

On January 19, 1889, after dark, Johnson, the deputy marshal, undertook to remove the Marlows, with Burkhart and Clift, imprisoned under like commitments, to the jail of an adjoining county. The six prisoners, shackled together, two and two, (Alfred with Charles, Epp with George, and Burkhart with Clift,) by irons riveted around one leg of each and connected by a chain, were placed in a hack driven by Martin, who was county attorney. Johnson, the defendant Wallace and two other men, all armed, followed in another hack; and the defendant Waggoner and another man, also armed, accompanied them in a buggy. When the three vehicles, in close order, had gone along the highway about two miles from Graham, they were attacked, near a run called Dry Creek, by a large body of men, armed and disguised, who opened fire upon the prisoners. Martin and the guards were in league with the attacking party. The four Marlows, in spite of their shackles, immediately dropped out of the hack, and wrested fire-arms, either from the guards or from their assailants, with which they defended themselves, killed two of the mob, wounded others, and finally put the rest to flight. Johnson was wounded, and he and all the guards also fled. Alfred Marlow and Epp Marlow were killed. The other two Marlows were severely wounded, but succeeded in freeing themselves from their brothers' dead bodies, took possession of the hack in which they had come, and together with Burkhart and Clift made their way to a neighboring village, and thence to the Denson Farm.

On the following day Collier, the new sheriff of the county, (one of the defendants in this case, who died before the trial,) went to the Denson Farm with a large body of men whom he had collected for the purpose of recapturing the two surviving Marlows. He was there met by the sheriff of a neighboring county, whose aid he had summoned, but who declined, on

learning the facts of the case, to interfere in the matter. The Marlows refused to give themselves up to any one except the United States marshal or one Morton, his deputy; and no violence was offered to them; but Collier, with a body of men, kept guard near the house for some days until the arrival of Morton, who, against some remonstrance on the part of Collier, took the Marlows into his custody and removed them to Dallas. They were afterwards tried and acquitted on the charges against them.

At the trial of the present case, the principal question of fact was of the defendants' connection with the conspiracy charged in the indictment.

There was evidence in the case tending to show that Johnson, while lying wounded at his home after the fight, assented, at the solicitation of some of the defendants, to the publication in a newspaper of a statement that Logan was one of the guards at Dry Creek on the night of January 19. The government, not for the purpose of contradicting Johnson, but as independent evidence that Logan took part in the fight, not as a guard, but as one of the mob, called several witnesses to prove declarations of Johnson made after the fight, some on the same night and others some days after, that Logan was not a guard on that night, had meant to go as a guard, but had been excused from going, and must have been the person who informed the mob of the intended removal of the prisoners. The defendants objected to the admission of this evidence, among other grounds, because the declarations were not made in Logan's presence, and were made after the crime had been committed and the conspirators had separated. The judge overruled the objection, and admitted the evidence; and the defendants excepted to its admission.

The court also admitted, against the like objection and exception of the defendants, testimony to declarations of Collier, of Hollis and of persons not known to the witnesses, some made on the night of the fight, after the escape of the Marlows, and while Collier, Hollis and others were in pursuit and were stopping at houses on their way to get other persons to join them, and some made on the following day at the

funeral of oné of the conspirators and elsewhere, that Logan had been present at the fight, and not as a guard, and had been wounded there.

The two surviving Marlows were permitted to testify, on behalf of the government, that while they, with Burkhart and Clift, were escaping in the hack after the fight, Charles Marlow told his companions that he believed Logan was the man at whom he shot, and who was shooting at him, during the fight. The defendants objected to this evidence, as declarations made in their absence, and as hearsay; and excepted to its admission.

The defendants requested the judge to instruct the jury that the matters alleged in the indictments and the proof made under them constituted no offence under the laws of the United States, and therefore they should return a verdict of not guilty. The judge refused so to instruct the jury; and instructed them as follows: "When a citizen of the United States is committed to the custody of a United States marshal, or to a state jail, by process issuing from one of the courts of the United States, to be held, in default of bail, to await his trial òn a criminal charge within the exclusive jurisdiction of the national courts, such citizen has a right, under the Constitution and laws of the United States, to a speedy and public trial by an impartial jury, and, until tried or discharged by due process of law, has the right, under said Constitution and laws, to be treated with humanity, and to be protected against all unlawful violence, while he is deprived of the ordinary means of defending and protecting himself." To this instruction, as well as to the refusal to give the instruction requested, the defendants excepted.

The judge further defined the crimes charged, of conspiracy, and of murder in the prosecution of the conspiracy; and submitted to the jury the questions whether the defendants were guilty of the conspiracy only, and whether they were guilty of the murder also.

Many other rulings and instructions, excepted to at the trial, are omitted from this statement, because not passed upon by this court.

On April 17, 1891, the jury found the defendants Logan, Waggoner and Wallace guilty of the conspiracy charged in the indictments, and not guilty of murder; and acquitted the other defendants. The court thereupon ordered and adjudged that the other defendants be discharged; and that Logan, Waggoner and Wallace were guilty of conspiracy as charged in the indictments, and sentenced each of them to pay a fine of $5000, to be imprisoned for a term of ten years; and to be ineligible to any office or place of honor, profit or trust, created by the Constitution or laws of the United States. On June 23, 1891, they sued out this writ of error, under the act of March 3, 1891, c. 517, § 5. 26 Stat. 827.

*Mr. Jerome C. Kearby* and *Mr. A. H. Garland* (with whom was *Mr. H. J. May* on the brief) for plaintiffs in error.

There are a few general propositions that should exercise a controlling influence in the decision of this case. The criminal jurisdiction of the United States courts must be *expressly* conferred by act of Congress: in other words: "The safe course undoubtedly is, to confine the jurisdiction in criminal cases to statute offences duly defined, and to cases within the *express* jurisdiction given by the Constitution," (1 Kent. Com. (13th ed. 332 *et seq.* and notes,) where all the leading cases are cited).

For a long period in the history of the country no attempt was ever made to get any criminal jurisdiction for the United States courts, except upon the high seas and at certain places under the special jurisdiction of Congress. Art. 1, sec. 8, cl. 17, Const.; Rev. Stat. sec. 5339 *et seq.* As was said by Chief Justice Marshall in *United States* v. *Bevans*, 3 Wheat. 336, 388, it is not the offence committed but the place in which it is committed, which must be out of the jurisdiction of the State. So far was this recognized that a soldier in the service of the United States killing a fellow-soldier was held amenable to the state laws and punished under them in the state courts in spite of the objection that he was liable only to the laws of the United States; and the act was done upon a soldier in

camp and under custody. *The People* v. *Godfrey*, 17 Johns. 225.

Outside of the places named, it was conceived the States could very well take care of all crimes committed within their territory; that their peace and dignity were offended by all such crimes outside of those places, and in fact there was no peace and dignity of the United States to be offended save and except in such places.

Among the first and most prominent departures from or innovations upon this rule was the case of *Tennessee* v. *Davis*, 100 U. S. 257, and that was sustained in an act of Congress. Rev. Stat. sec. 643, and the act of March 3, 1875, 18 Stat. p. 401. There was a special act giving this jurisdiction by removal from the state court, but the path to that result was not smooth and open, nor by any means discernible to all; for there is a dissent by Justices Clifford and Field of great energy and power, which is believed by many of the legal profession to be the law of the case. But there was an express act giving this jurisdiction, so far as Congress had the power to give it. But here, as we shall see, it is quite otherwise. Some other cases have occurred since *Tennessee* v. *Davis* on special statutes; but in each of them firm and unyielding opposition by a portion of the court was made. It will serve no useful purpose to refer to them here, as the court is familiar with them, and besides they rest upon statutes whose language is not doubtful conceding the power of Congress to enact them.

Then comes the question, "Why could not Texas punish these people for committing assaults, aggravated assaults, or murder within her unquestioned and unquestionable boundaries?" Her criminal code, it seems, is most ample for this purpose. It would be assuming too much to say she would not try to do it. But if this unfortunately were so, jurisdiction would not come to the United States court because Texas failed to do her duty. This will not stand the test. There must be some *express* law giving the jurisdiction, and that law must be constitutional. These men who were assaulted were in custody of the marshal, but that did not affect the jurisdiction of the State; whatever crime was committed was against

Texas. Godfrey (17 Johns. *ubi supra*) was; as the man he stabbed was, in the military service of the government, and the deceased was in camp and in custody too.

In casting about for reasons for taking these matters out of the Texas courts and from the Texas authorities it would appear from the indictment and from the elaborate charge of the trial court that sections 5508 and 5509 Rev. Stat. are resorted to as allowing this.

It would be tedious to go over and review the history of these sections, the reasons and purposes of their enactment. This has been done so often by this court in cases of the gravest character that no one at all up in the history of the country can well be ignorant on the subject. But it is perfectly safe to say, no such *right* and *privilege* as set forth here ever figured in the minds of the legislators in making these statutes. They came into life for different uses and objects entirely.

In a recent case before Justice Lamar in Georgia, these statutes are discussed with great clearness and accuracy in an opinion reviewing all the cases on this subject, and he points out most distinctly the scope and meaning of those acts, as reaching and applying to matters altogether foreign to anything disclosed in and by this record. The *right* in that case was that of a witness to appear and testify before the grand jury of a Federal court — a right — *if a right*, and not a duty, possibly as high and important as the right of a person or persons to be tried, who were held on commitments as alleged. In that case Justice Lamar demonstrates the *privilege* or *right* of a witness to appear, and it is not such as comes within the purview of the acts referred to. We adopt his reasoning without attempting to add to it. He says (48 Fed. Rep. 78, 83, 84):

"The Congress of the United States clearly possesses the constitutional power and is charged with the constitutional duty to protect all agencies of the Federal government, including the courts, their officers and all persons whose attendance is necessary in the proceedings of those courts, such as parties, witnesses and jurors. That power and duty of protection have been exercised and performed with regard to parties, witnesses and jurors in section 5406 of the Revised Statutes.

"With respect to a prosecution for crime pending in a Federal court, or in a United States grand jury, the right which this particular section designs to protect is a *public* right, *i.e.* the right of the United States to have its witnesses and their testimony, and to have them protected in going to and returning from the court. The wrong punished in such a case is a public wrong, and its correlative is a public right."

"Section 5508 presupposes that the 'right and privilege,' involved has already been secured by the Constitution and laws of the United States, and therefore it is necessary to turn to them for the definition of the right in this indictment charged to be violated, in order to determine whether the indictment is authorized by the provisions of that section.

"Fortunately we are not without judicial construction of these provisions and of other statutes relating to cognate subjects, as well as judicial expositions of the constitutional amendments, which, it is contended, contained the authority for their enactment. *Slaughter-House Cases*, 16 Wall. 36; *United States* v. *Cruikshank*, 1 Woods, 308; *United States* v. *Cruikshank*, 92 U. S. 542; *United States* v. *Reese*, 92 U. S. 214; *United States* v. *Harris*, 106 U. S. 629; *Strauder* v. *West Virginia*, 100 U. S. 303; *Ex parte Virginia*, 100 U. S. 339; *Bradwell* v. *The State*, 16 Wall. 130; *Hurtado* v. *California*, 110 U. S. 516; *Civil Rights Cases*, 109 U. S. 3; *Ex parte Yarbrough*, 110 U. S. 651; *United States* v. *Waddell*, 112 U. S. 76."

"In these decisions of the Supreme Court it has been found necessary to pass upon the construction of these and many other sections of the Revised Statutes in their application to the varying facts presented by each case. But they all show the steady adherence of that court to the fundamental principles enunciated by Mr. Justice Bradley in the case of *The United States* v. *Cruikshank*, 1 Woods, 308, and reiterated by the Supreme Court of the United States in the same case on a writ of error. They all agree that, aside from the extinction of slavery and the declaration of national citizenship, the constitutional amendments are restrictive upon the power of the general government and the action of the States, and that there is nothing in their language or spirit which indicates

that they are to be enforced by Congressional enactments, authorizing the trial, conviction and punishment of individuals for individual invasions of individual rights, unless committed under state authority; that the Fourteenth Amendment guaranteed immunity from state laws and state acts invading the privileges and rights specified in the amendment, but conferred no rights upon one citizen as against another; that the provision of the Fourteenth Amendment authorizing Congress to enforce its guarantees by legislation means such legislation as is necessary to control and counteract state abridgment, and that the protection and enforcement of the rights of citizens of the United States provided in the Enforcement Act of 1870 and the Civil Rights Act of 1875 refer only to such rights as are granted by and dependent on the Constitution and the valid and constitutional laws of the United States."

" But there is another view which demonstrates that this section does not sustain the indictment in this case. We cannot present it more forcibly than by quoting the following from the opinion of the Supreme Court, delivered by Mr. Justice Bradley in the *Civil Rights Cases*, 109 U. S. 3, 16, 17, 18. Referring to the provisions as above quoted, and other subsequent provisions in the statute from which the section was taken, the learned justice says:

" ' This law is clearly corrective in its character, *intended to counteract and furnish redress against state laws and proceedings*, and customs having the force of law, *which sanction the wrongful acts specified*. In the Revised Statutes, it is true, a very important clause, to wit, the words, " any law, statute, ordinance, regulation or custom to the contrary notwithstanding," which gave the declaratory section its point and effect, are omitted; but the penal part by which the declaration is enforced, and which is really the effective part of the law, retains the reference to state laws, by making the penalty apply only to those who should subject parties to a deprivation of their rights under color of any statute, ordinance, custom, etc., of any State or Territory, thus preserving the corrective character of the legislation. Rev. Stat. §§ 1977, 1978, 1979, 5510. . . . In this connection, it is proper to state that

civil rights, such as are guaranteed by the Constitution against state aggression, cannot be impaired by the wrongful acts of individuals unsupported by state authority in the shape of laws, customs or judicial or executive proceedings. The wrongful act of an individual, unsupported by any such authority, is simply a private wrong, or a crime of that individual; an invasion of the rights of the injured party, it is true, whether they affect his person, his property or his reputation, but if not sanctioned in some way by the State, or not done under state authority, his rights remain in full force, and may presumably be vindicated by resort to the laws of the State for redress. An individual cannot deprive a man of his right to vote, to hold property, to buy and sell, to sue in the courts or to be a witness or a juror; he may by force or fraud interfere with the enjoyment of the right in a particular case; he may commit an assault against the person, or commit murder, or use ruffian violence at the polls, or slander the good name of a fellow-citizen, but unless protected in these wrongful acts by some shield of state law or state authority he cannot destroy or injure the right; he will only render himself amenable to satisfaction or punishment, and amenable therefor to the laws of the State where the wrongful acts are committed. Hence, in all those cases where the Constitution seeks to protect the rights of the citizen against discriminative and unjust laws of the State by prohibiting such laws, it is not individual offences, but abrogation and denial of rights, which it denounces, and for which it clothes the Congress with the power to provide a remedy.' "

" ' And the remedy to be provided must necessarily be predicated upon that wrong. It must assume that in the case provided for, the evil or wrong actually committed rests upon some state law or state authority for its excuse and perpetration.' "

*Mr. Solicitor General* for defendant in error.

MR. JUSTICE GRAY, after stating the case as above, delivered the opinion of the court.

The plaintiffs in error were indicted on sections 5508 and

5509 of the Revised Statutes, for conspiracy, and for murder in the prosecution of the conspiracy; and were convicted, under section 5508, of a conspiracy to injure and oppress citizens of the United States in the free exercise and enjoyment of the right to be secure from assault or bodily harm, and to be protected against unlawful violence, while in the custody of a marshal of the United States under a lawful commitment by a commissioner of the Circuit Court of the United States for trial for an offence against the laws of the United States.

By section 5508 of the Revised Statutes, "if two or more persons conspire to injure, oppress, threaten or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same," "they shall be fined not more than five thousand dollars and imprisoned not more than ten years, and shall, moreover, be thereafter ineligible to any office or place of honor, profit, or trust, created by the Constitution or laws of the United States."

: 1. The principal question in this case is whether the right of a citizen of the United States, in the custody of a United States marshal under a lawful commitment to answer for an offence against the United States, to be protected against lawless violence, is a right secured to him by the Constitution or laws of the United States, or whether it is a right which can be vindicated only under the laws of the several States.

This question is presented by the record in several forms. It was raised in the first instance by the defendants "excepting to" and moving to quash the indictment. A motion to quash an indictment is ordinarily addressed to the discretion of the court, and therefore a refusal to quash cannot generally be assigned for error. *United States* v. *Rosenburgh*, 7 Wall. 580; *United States* v. *Hamilton*, 109 U. S. 63. But the motion in this case appears to have been intended and understood to include an exception, which, according to the practice in Louisiana and Texas, is equivalent to a demurrer. And the same question is distinctly presented by the judge's refusal to

instruct the jury as requested, and by. the instructions given by him to the jury.

. Upon this question, the court has no doubt. As was said ᐧby Chief Justice Marshall, in the great case of *McCulloch* v. *Maryland,* " The government of the Union, though limited in its powers, is supreme within its sphere of action." " No trace is to be found in the Constitution of an intention to. create a dependence of the government of the Union on those of the States, for the execution of the great powers assigned to it. . Its means are adequate to its ends; and on those means alone was it expected to rely for the accomplishment of ᐧits ends. To impose on it the necessity of resorting to means which it cannot control, which another government may furnish or withhold, would render its course precarious, the result of its measures uncertain, and create a dependence on other governments, which might disappoint its most important designs, and is incompatible with the language of the Constitution." 4 Wheat. 316, 405, 424.

Among the powers which the Constitution expressly confers upon Congress is the power to make all laws necessary and proper for carrying into execution the powers specifically granted to it, and all other powers vested by the Constitution in·the government of the United States, or in any department or officer thereof. In the. exercise of this general power of legislation, Congress may use any means, appearing to it most eligible and appropriate, which are adapted to the end to be accomplished, and are consistent with the letter and the spirit of the Constitution. *McCulloch* v. *Maryland,* 4 Wheat.· 316, 421; *Juilliard* v. *Greenman,* 110 U. S. 421, 440, 441.

Although the Constitution contains no grant, general or specific, to Congress of the power to provide for the punishment of crimes, except piracies and felonies on the high seas, offences against the law of nations, treason, and counterfeiting the securities and current coin of the United States, no one doubts the power of Congress to provide for the punishment of all crimes and offences against the United States, whether committed within one of the States of the Union, or within territory over . which Congress has plenary and exclusive jurisdiction.

To accomplish this end, Congress has the right to enact laws for the arrest and commitment of those accused of any such crime or offence, and for holding them in safe custody until indictment and trial; and persons arrested and held pursuant to such laws are in the exclusive custody of the United States, and are not subject to the judicial process or executive warrant of any State. *Ableman* v. *Booth*, 21 How. 506; *Tarble's Case*, 13 Wall. 397; *Robb* v. *Connolly*, 111 U. S. 624. The United States, having the absolute right to hold such prisoners, have an equal duty to protect them, while so held, against assault or injury from any quarter. The existence of that duty on the part of the government necessarily implies a corresponding right of the prisoners to be so protected; and this right of the prisoners is a right secured to them by the Constitution and laws of the United States.

The statutes of the United States have provided that any person accused of a crime or offence against the United States may by any United States judge or commissioner of a Circuit Court be arrested and confined, or bailed, as the case may be, for trial before the court of the United States having cognizance of the offence; and, if bailed, may be arrested by his bail, and delivered to the marshal or his deputy, before any judge or other officer having power to commit for the offence, and be thereupon recommitted to the custody of the marshal, to be held until discharged by due course of law. Rev. Stat. §§ 1014, 1018. They have also provided that all the expenses attendant upon the transportation from place to place, and upon the temporary or permanent confinement, of persons arrested or committed under the laws of the United States, shall be paid out of the Treasury of the United States; and that the marshal, in case of necessity, may provide a convenient place for a temporary jail, and "shall make such other provision as he may deem expedient and necessary for the safe-keeping of the prisoners arrested or committed under the authority of the United States, until permanent provision for that purpose is made by law." Rev. Stat. §§ 5536-5538.

In the case at bar, the indictments alleged, the evidence at the trial tended to prove, and the jury have found by their

verdict, that while Charles Marlow and five others, citizens of the United States, were in the custody and control of a deputy marshal of the United States under writs of commitment from a commissioner of the Circuit Court, in default of bail, to answer to indictments for an offence against the laws of the United States, the plaintiffs in error conspired to injure and oppress them in the free exercise and enjoyment of the right, secured to them by the Constitution and laws of the United States, to be protected, while in such custody and control of the deputy marshal, against assault and bodily harm, until they had been discharged by due process of the laws of the United States.

If, as some of the evidence introduced by the government tended to show, the deputy marshal and his assistants made no attempt to protect the prisoners, but were in league and collusion with the conspirators, that does not lessen or impair the right of protection, secured to the prisoners by the Constitution and laws of the United States.

The prisoners were in the exclusive custody and control of the United States, under the protection of the United States, and in the peace of the United States. There was a co-extensive duty on the part of the United States to protect against lawless violence persons so within their custody, control, protection and peace; and a corresponding right of those persons, secured by the Constitution and laws of the United States, to be so protected by the United States. If the officers of the United States, charged with the performance of the duty, in behalf of the United States, of affording that protection and securing that right, neglected or violated their duty, the prisoners were not the less under the shield and panoply of the United States.

The cases heretofore decided by this court, and cited in behalf of the plaintiffs in error, are in no way inconsistent with these views, but, on the contrary, contain much to support them. The matter considered in each of those cases was whether the particular right there in question was secured by the Constitution of the United States, and was within the acts of Congress. But the question before us is so important, and the learned counsel for the plaintiffs in error have

so strongly relied on those cases, that it is fit to review them in detail.

In *United States* v. *Reese,* 92 U. S. 214, 217, decided at October term, 1875, this court, speaking by Chief Justice Waite, said : " Rights and immunities created by or dependent upon the Constitution of the United States can be protected by Congress. The form and the manner of the protection may be such as Congress, in the legitimate exercise of its legislative discretion, shall provide. These may be varied to meet the necessities of the particular right to be protected." The decision in that case was that the Fifteenth Amendment of the Constitution did not confer on citizens of the United States the right to vote, but only the right of exemption from being denied by a State the right to vote on account of race, color, or previous condition of servitude ; and therefore that sections 3 and 4 of the Enforcement Act of May 31, 1870, (16 Stat. 140, 141, reënacted in Rev. Stat. §§ 2007–2009, 5506,) undertaking to punish the denial or obstruction of the right to vote under the laws of any State or Territory, and not grounded on such discrimination, were unconstitutional.

In *United States* v. *Cruikshank*, 92 U. S. 542, at the same term, in which also the opinion was delivered by the Chief Justice, the indictment was on section 6 of the Enforcement Act of 1870, (reënacted in Rev. Stat. § 5508, under which the present conviction was had,) and the points adjudged on the construction of the Constitution and the extent of the powers of Congress were as follows:

1st. It was held that the First Amendment of the Constitution, by which it was ordained that Congress should make no law abridging the right of the people peaceably to assemble and to petition the government for a redress of grievances, did not grant to the people the right peaceably to assemble for lawful purposes, but recognized that right as already existing, and did not guarantee its continuance except as against acts of Congress ; and therefore the general right was not a right secured by the Constitution of the United States. But the court added : " The right of the people peaceably to assemble for the purpose of petitioning Congress for a redress of

grievances, or for anything else connected with the powers or the duties of the national government, is an attribute of national citizenship, and, as such, under the protection of, and guaranteed by, the United States. The very idea of a government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs and to petition for a redress of grievances. If it had been alleged in these counts that the object of the defendants was to prevent a meeting for such a purpose, the case would have been within the statute, and within the scope of the sovereignty of the United States." 92 U. S. 552, 553.

2d. It was held that the Second Amendment of the Constitution, declaring that "the right of the people to keep and bear arms shall not be infringed," was equally limited in its scope. 92 U. S. 553.

3d. It was held that a conspiracy of individuals to injure, oppress and intimidate citizens of the United States, with intent to deprive them of life and liberty without due process of law, did not come within the statute, nor under the power of Congress, because the rights of life and liberty were not granted by the Constitution, but were natural and inalienable rights of man; and that the Fourteenth Amendment of the Constitution, declaring that no State shall deprive any person of life, liberty or property, without due process of law, added nothing to the rights of one citizen as against another, but simply furnished an additional guaranty against any encroachment by the States upon the fundamental rights which belong to every citizen as a member of society. It was of these fundamental rights of life and liberty, not created by or dependent on the Constitution, that the court said: "Sovereignty, for this purpose, rests alone with the States. It is no more the duty or within the power of the United States to punish for a conspiracy to falsely imprison or murder within a State, than it would be to punish for false imprisonment or murder itself." 92 U. S. 553, 554.

4th. It was held that the provision of the Fourteenth Amendment, forbidding any State to deny to any person within its

jurisdiction the equal protection of the laws, gave no greater power to Congress.  92 U. S. 555.

5th.  It was held, in accordance with *United States* v. *Reese,* above cited, that counts for conspiracy to prevent and hinder citizens of the African race in the free exercise and enjoyment of the right to vote at state elections, or to injure and oppress them for having voted at such elections, not alleging that this was on account of their race, or color, or previous condition of servitude, could not be maintained; the court saying: "The right to vote in the States comes from the States; but the right of exemption from the prohibited discrimination comes from the United States.  The first has not been granted or secured by the Constitution of the United States, but the last has been."  92 U. S. 556.

Nothing else was decided in *United States* v. *Cruikshank,* except questions of the technical sufficiency of the indictment, having no bearing upon the larger questions.

The main principles on which that decision was based had been clearly summed up by Mr. Justice Bradley when the same case was before the Circuit Court, as follows: "It is undoubtedly a sound proposition, that whenever a right is guaranteed by the Constitution of the United States, Congress has the power to provide for its enforcement, either by implication arising from the correlative duty of government to protect, wherever a right to the citizen is conferred, or under the general power (contained in art. 1, sec. 8, par. 18) 'to make all laws necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the government of the United States, or any department or officer thereof.'"  "With regard to those acknowledged rights and privileges of the citizen, which form a part of his political inheritance derived from the mother country, and which were challenged and vindicated by centuries of stubborn resistance to arbitrary power, they belong to him as his birthright, and it is the duty of the particular State of which he is a citizen to protect and enforce them, and to do naught to deprive him of their full enjoyment.  When any of these rights and privileges are secured in the Constitu-

tion of the United States only by a declaration that the State or the United States shall not violate or abridge them, it is at once understood that they are not created or conferred by the Constitution, but that the Constitution only guarantees that they shall not be impaired by the State, or the United States, as the case may be. The fulfilment of this guaranty by the United States is the only duty with which that government is charged. The affirmative enforcement of the rights and privileges themselves, unless something more is expressed, does not devolve upon it, but belongs to the state government as a part of its residuary sovereignty." 1 Woods, 308, 314–316.

In *Strauder v. West. Virginia*, 100 U. S. 303, at October term, 1879, in which it was adjudged that the provision of the Fourteenth Amendment, forbidding any State to deny to any person within its jurisdiction the equal protection of the laws, was violated by statutes of a State providing that white men only should be the jurors on the trial of a black man, the court, speaking by Mr. Justice Strong, said: "A right or an immunity, whether created by the Constitution or only guaranteed by it, even without any express delegation of power, may be protected by Congress." 100 U. S. 310.

In *Ex parte Virginia*, 100 U. S. 339, at the same term, the court upheld the constitutionality of the Civil Rights Act of March 1, 1875, c. 114, § 4, (18 Stat. 336,) enacting that no citizen, having all other qualifications provided by law, should be disqualified from service as a juror in any court of the United States or of any State, on account of race, color, or previous condition of servitude, and that any officer, charged with the duty of selecting jurors, who should exclude any citizen for such cause, should be guilty of a misdemeanor.

In *United States* v. *Harris,* 106 U. S. 629, at October term, 1882, the indictment was for conspiring to deprive, and for depriving, certain citizens of the United States of the equal protection of the laws, in this, that they were in the custody of officers of a State under lawful arrest on charges of crime, and were, "by the laws of said State, entitled to the due and equal protection of the laws thereof," and "to have their per-

sons protected from violence when so under arrest as afore-said." That indictment was on section 5519 of the Revised Statutes, which assumed to punish a conspiracy for the purpose of depriving any person or class of persons of the equal protection of the laws. The court, following the cases of *Reese* and *Cruikshank*, above stated, held that section to be unconstitutional, because broader than the Thirteenth, Fourteenth and Fifteenth Amendments to the Constitution of the United States would justify. The case is clearly distinguished from the case at bar by the facts that those prisoners were in the custody of officers, not of the United States, but of the State, and that the laws, of the equal protection of which they were alleged to have been deprived, were the laws of the State only.

In the cases reported under the head of the *Civil Rights Cases*, 109 U. S. 3, at October term, 1883, the whole extent of the decision was that sections 1 and 2 of the Civil Rights Act of March 1, 1875, c. 114, (18 Stat. 336,) declaring all persons within the jurisdiction of the United States to be entitled to the full and equal enjoyment of inns, public conveyances, and places of public amusement, and assuming to punish the denial of such enjoyment to any citizen, "except for reasons by law applicable to citizens of every race and color, and regardless of any previous condition of servitude," were unconstitutional, because not authorized, either by the Thirteenth Amendment, abolishing slavery, or by the Fourteenth Amendment, the general scope and purpose of which were thus defined by Mr. Justice Bradley in delivering judgment: "It is state action of a particular character that is prohibited. Individual invasion of individual rights is not the subject matter of the Amendment." "It does not invest Congress with power to legislate upon subjects which are within the domain of state legislation; but to provide modes of relief against state legislation, or state action, of the kind referred to. It does not authorize Congress to create a code of municipal law for the regulation of private rights; but to provide modes of redress against the operation of state laws, and the action of state officers, executive or judicial, when these are subver-

sive of the fundamental rights specified in the Amendment." " Such legislation cannot properly cover the whole domain of. rights appertaining to life, liberty and property, defining them and providing for their vindication. That would be to establish a code of municipal law regulative of all private rights between man and man in society. It would be to make Congress take the place of the state legislatures and to supersede them." 109 U. S. 11, 13.

In *Ex parte Yarbrough*, 110 U. S. 651, at the same term, it was adjudged that both section 5508 of the Revised Statutes (on which these indictments are founded) and section 5520, punishing conspiracy to prevent by force, intimidation or threats any citizen from lawfully giving his support to the election of a qualified person as presidential elector or member of Congress, were constitutional, because within the implied powers of Congress. In answer to the argument that the parties assaulted were not officers of the United States, and that their protection by Congress in exercising the right to vote did not stand on the same ground with the protection of election officers of the United States, the court, speaking by Mr. Justice Miller, said: " But the distinction is not well taken. The power in either case arises out of the circumstance that the function in which the party is engaged, or the right which he is about to exercise, is dependent on the laws of the United States. In both cases, it is the duty of that government to see that he may exercise this right freely, and to protect him from violence while so doing, or on account of so doing. This duty does not arise solely from the interest of the party concerned, but from the necessity of the government itself, that its service shall be free from the adverse influence of force and fraud practised on its agents, and that the votes by which its members of Congress and its President are elected shall be the free votes of the electors, and the officers thus chosen the free and uncorrupted choice of those who have the right to take part in that choice." 110 U. S. 662.

In *United States* v. *Waddell*, 112 U. S. 76, at October term, 1884, the court reaffirmed the constitutionality of section 5508 of the Revised Statutes, and, speaking by the same eminent

judge, said : " The statute itself is careful to limit its operation to an obstruction or oppression in ' the free exercise of a right or privilege secured by the Constitution or laws of the United States, or because of his having exercised such rights.' The protection of this section extends to no other right, to no right or privilege dependent on a law or laws of the State. Its object is to guarantee safety and protection to persons in the exercise of rights dependent on the laws of the United States, including, of course, the Constitution and treaties as well as statutes, and it does not, in this section at least, design to protect any other rights." 112 U. S. 79. The particular right, held in that case to be dependent on and secured by the laws of the United States, and to be protected by section 5508 of the Revised Statutes against interference by individuals, was the right of a citizen, having made a homestead entry on public land, within the limits of a State, to continue to reside on the land for five years, for the purpose of perfecting his title to a patent, under sections 2289–2291 of the Revised Statutes, of which the court said : " The right here guaranteed is not the mere right of protection against personal violence. This, if the result of an ordinary quarrel or malice, would be cognizable under the laws of the State and by its courts. But it is something different from that. It is the right to remain on the land in order to perform the requirements of the act of Congress, and, according to its rules, perfect his incipient title. Whenever the acts complained of are of a character to prevent this, or throw obstruction in the way of exercising this right, and for the purpose and with intent to prevent it, or to injure or oppress a person because he has exercised it, then, because it is a right asserted under the law of the United States and granted by that law, those acts come within the purview of the statute and of the constitutional power of Congress to make such statute." 112 U. S. 80.

In *Baldwin* v. *Franks*, 120 U. S. 678, at October term, 1886, it was decided that the word " citizen," in section 5508 of the Revised Statutes, as in the original act of May 31, 1870, c. 114, § 6, was used in its political sense, and not as synonymous with " resident," " inhabitant " or " person," and therefore did

not include an alien. It was in regard to that point that Chief Justice Waite said: "This particular section is a substantial reënactment of section 6 of the original act, which is found among the sections that deal exclusively with the political rights of citizens, especially their right to vote, and were evidently intended to prevent discriminations in this particular against voters on account 'of race, color, or previous condition of servitude.'" 120 U. S. 691. He did not say that the section in question, but only that the sections among which it is found, "deal exclusively with the political rights of citizens." To have said that the section in question was so limited would have been in direct conflict with the decision in *United States* v. *Waddell*, above cited, to which the Chief Justice, at the outset of his discussion of the question whether "citizen" included an alien, had referred as establishing the constitutionality of the section.

The whole scope and effect of this series of decisions is that, while certain fundamental rights, recognized and declared, but not granted or created, in some of the Amendments to the Constitution, are thereby guaranteed only against violation or abridgment by the United States, or by the States, as the case may be, and cannot therefore be affirmatively enforced by Congress against unlawful acts of individuals; yet that every right, created by, arising under or dependent upon, the Constitution of the United States, may be protected and enforced by Congress by such means and in such manner as Congress, in the exercise of the correlative duty of protection, or of the legislative powers conferred upon it by the Constitution, may in its discretion deem most eligible and best adapted to attain the object.

Among the particular rights which this court, as we have seen, has adjudged to be secured, expressly or by implication, by the Constitution and laws of the United States, and to be within section 5508 of the Revised Statutes, providing for the punishment of conspiracies by individuals to oppress or injure citizens in the free exercise and enjoyment of rights so secured, are the political right of a voter to be protected from violence while exercising his right of suffrage under the laws of the

United States; and the private right of a citizen, having made a homestead entry, to be protected from interference while remaining in the possession of the land for the time of occupancy which Congress has enacted shall entitle him to a patent.

In the case at bar, the right in question does not depend upon any of the Amendments to the Constitution, but arises out of the creation and establishment by the Constitution itself of a national government, paramount and supreme within its sphere of action. Any government which has power to indict, try and punish for crime, and to arrest the accused and hold them in safekeeping until trial, must have the power and the duty to protect against unlawful interference its prisoners so held, as well as its executive and judicial officers charged with keeping and trying them.

In the very recent Case of Neagle, 135 U. S. 1, at October term, 1889, it was held that, although there was no express act of Congress authorizing the appointment of a deputy marshal or other officer to attend a justice of this court while travelling in his circuit, and to protect him against assault or injury, it was within the power and the duty of the Executive Department to protect a judge of any of the courts of the United States, when there was just reason to believe that he would be in personal danger while executing the duties of his office; that an assault upon such a judge, while in discharge of his official duties, was a breach of the peace of the United States, as distinguished from the peace of the State in which the assault took place; and that a deputy marshal of the United States, specially charged with the duty of protecting and guarding a judge of a court of the United States, had imposed upon him the duty of doing whatever might be necessary for that purpose, even to the taking of human life.

In delivering judgment, Mr. Justice Miller, repeating the language used by Mr. Justice Bradley speaking for the court in Ex parte Siebold, 100 U. S. 371, 394, said: "It is argued that the preservation of peace and good order in society is not within the powers confided to the government of the United States, but belongs exclusively to the States. Here again we

are met with the theory that the government of the United States does not rest upon the soil and territory of the country. We think that this theory is founded on an entire misconception of the nature and powers of that government. We hold it to be an incontrovertible principle, that the government of the United States may, by means of physical force, exercised through its official agents, execute on every foot of American soil the powers and functions that belong to it. This necessarily involves the power to command obedience to its laws, and hence the power to keep the peace to that extent." 135 U. S. 60. After further discussion of that question, and of the powers of sheriffs in the State of California, where the transaction took place, Mr. Justice Miller added : "That there is a peace of the United States; that a man assaulting a judge of the United States while in the discharge of his duties violates that peace; that in such case the marshal of the United States stands in the same relation to the peace of the United States which the sheriff of the county does to the peace of the State of California; are questions too clear to need argument to prove them." 135 U. S. 69.

The United States are bound to protect against lawless violence all persons in their service or custody in the course of the administration of justice. This duty and the correlative right of protection are not limited to the magistrates and officers charged with expounding and executing the laws, but apply, with at least equal force, to those held in custody on accusation of crime, and deprived of all means of self-defence.

For these reasons, we are of opinion that the crime of which the plaintiffs in error were indicted and convicted was within the reach of the constitutional powers of Congress, and was covered by section 5508 of the Revised Statutes; and it remains to be considered whether they were denied any legal right by the other rulings and instructions of the Circuit Court.

2. The objection to the consolidation of the indictments on which the plaintiffs in error were tried and convicted cannot prevail.

Congress has enacted that, "when there are several charges against any person for the same act or transaction, or for two

or more acts or transactions connected together, or for two or more acts or transactions of the same class of crimes or offences, which may be properly joined, instead of having several indictments the whole may be joined in one indictment in separate counts; and if two or more indictments are found in such cases, the court may order them to be consolidated." Rev. Stat. § 1024.

The record before us shows that the court below at different times made three orders of consolidation.

The only exception taken by the defendants to any of these orders was to the first one, made at October term, 1890, by which four of the indictments on which a trial was afterwards had were ordered to be consolidated with five earlier indictments which included other defendants and different offences.

By the second order of consolidation, made on a subsequent day of the same term, the five earlier indictments were ordered to be separated, so that in this respect the case stood as if they had never been consolidated with the four later ones; two of the defendants in one of these four indictments were ordered to be severed and tried separately; and the former order of consolidation was confirmed as to the four indictments, all of which, as they then stood, were charges against the same persons "for the same act or transaction," or, at least, "for two or more acts or transactions connected together," and therefore within the very terms and purpose of the section of the Revised Statutes above quoted, and might perhaps have been ordered, in the discretion of the court, to be tried together, independently of any statute upon the subject. See *United States* v. *Yarbrough*, 110 U. S. 651, 655; *United States* v. *Marchant*, 12 Wheat. 480; *Withers* v. *Commonwealth*, 5 S. & R. 59. And to this order no exception was taken.

By the third order of consolidation, indeed, made at February term, 1891, shortly before the trial, a new indictment against different persons for the same crime was consolidated with the four indictments. But it is unnecessary to consider whether this was open to objection, since none of the defendants objected or excepted to it. They may all have considered it more advantageous or more convenient to have

the new indictment tried together with the other forr. Having gone to trial, without objection, on the indic. nents as consolidated under the last order of the court, it was not open to any of them to take the objection for the first time after verdict.

3. The objection made to the four indictments, that they should have been found by the grand jury at Graham and not at Dallas, is based on a misapprehension of the acts of Congress upon that subject. By the act of February 24, 1879, c. 97, § 1, creating the Northern Judicial District of Texas, Young County is one of the counties included in that district; by § 4 the terms of the courts in that district are to be held at Waco, at Dallas and at Graham; and by § 5, "all process issued against defendants residing in the counties of" Young and certain adjoining counties "shall be returned to Graham," and against defendants residing in certain other counties to Waco and to Dallas respectively. 20 Stat. 318, 319. By the act of June 14, 1880, c. 213, that act is amended by adding, at the end of section 5, these words: "And all prosecutions in either of said districts for offences against the laws of the United States shall be tried in that division of the district to which process for the county in which said offences are committed is by said section required to be returned; and all writs and recognizances in said prosecutions shall be returned to that division in which said prosecutions by this act are to be tried." 21 Stat. 198. This provision does not affect the authority of the grand jury for the district, sitting at any place at which the court is appointed to be held, to present indictments for offences committed anywhere within the district. It only requires the trial to be had, and writs and recognizances to be returned, in the division in which the offence is committed. The finding of the indictment is no part of the trial. And these indictments were tried at Graham in conformity with the statute.

4. The plea of former jeopardy was rightly held bad. It averred that the discharge of the jury at the former trial without the defendants' consent was by the court, of its own motion, and after the jury, having been in retirement to con-

sider their verdict for forty hours, had announced in open court that they were unable to agree as to these defendants. The further averment that "there existed in law or fact no emergency or hurry for the discharge of said jury, nor was said discharge demanded for the ends of public justice," is an allegation, not so much of specific and traversable fact, as of inference and opinion, which cannot control the effect of the facts previously alleged. Upon those facts, whether the discharge of the jury was manifestly necessary in order to prevent a defeat of the ends of public justice, was a question to be finally decided by the presiding judge in the sound exercise of his discretion. *United States* v. *Perez*, 9 Wheat. 579; *Simmons* v. *United States*, 142 U. S. 148.

5. As the defendants were indicted and to be tried for a crime punishable with death, those jurors who stated on *voir dire* that they had "conscientious scruples in regard to the infliction of the death penalty for crime" were rightly permitted to be challenged by the government for cause. A juror who has conscientious scruples on any subject, which prevent him from standing indifferent between the government and the accused, and from trying the case according to the law and the evidence, is not an impartial juror. This court has accordingly held that a person who has a conscientious belief that polygamy is rightful may be challenged for cause on a trial for polygamy. *Reynolds* v. *United States*, 98 U. S. 145, 147, 157; *Miles* v. *United States*, 103 U. S. 304, 310. And the principle has been applied to the very question now before us by Mr. Justice Story in *United States* v. *Cornell*, 2 Mason, 91, 105, and by Mr. Justice Baldwin in *United States* v. *Wilson*, Baldwin, 78, 83, as well as by the courts of every State in which the question has arisen, and by express statute in many States. Whart. Crim. Pl. (9th ed.) § 664.

6. In support of the objection to the competency of the two witnesses who had been previously convicted and sentenced for felony, the one in North Carolina, and the other in Texas, the plaintiffs in error relied on article 730 of the Texas Code of Criminal Procedure of 1879, which makes incompetent to testify in criminal cases "all persons who have been or may

be convicted of felony in this State or in any other jurisdiction, unless such conviction has been legally set aside, or unless the convict has been legally pardoned for the crime of which he was convicted."

By an act of the congress of the Republic of Texas of December 20, 1836, § 41, "the common law of England, as now practised and understood, shall, in its application to juries and to evidence, be followed and practised by the courts of this republic, so far as the same may not be inconsistent with this act, or any other law passed by this congress." 1 Laws of Republic of Texas (ed. 1838) 156. That act was in force at the time of the admission of Texas into the Union in 1845. The first act of the State of Texas on the incompetency of witnesses, by reason of conviction of crime, appears to have been the statute of February 15, 1858, c. 151, by which all persons convicted of felony, in Texas or elsewhere, were made incompetent to testify in criminal actions, notwithstanding a pardon, unless their competency to testify had been specifically restored. General Laws of 7th Legislature of Texas, 242; Oldham & White's Digest, 640. That provision was afterwards put in the shape in which it stands in the Code of 1879, above cited.

The question whether the existing statute of the State of Texas upon this subject is applicable to criminal trials in the courts of the United States held within the State depends upon the construction and effect of section 858 of the Revised Statutes of the United States, which is as follows : " In the courts of the United States no witness shall be excluded in any action on account of color, or in any civil action because he is a party to or interested in the issue tried: provided, that in actions by or against executors, administrators or guardians, in which judgment may be rendered for or against them, neither party shall be allowed to testify against the other as to any transaction with, or statement by, the testator, intestate or ward, unless called to testify thereto by the opposite party, or required to testify thereto by the court. In all other respects, the laws of the State in which the court is held shall be the rules of decision as to the competency of witnesses in the

courts of the United States in trials at common law, and in equity and admiralty."

In the provision, at the beginning of this section, that "in the courts of the United States no witness shall be excluded in any action on account of color, or in any civil action because he is a party to or interested in the issue tried," the distinction between "any civil action" in the second clause, and "any action" in the first clause, shows that the first clause was intended to include criminal actions, or, as they are more commonly called, criminal cases, while the second clause was in terms restricted to civil actions only. *Green* v. *United States*, 9 Wall. 655, 658. And were the whole section to be considered by itself, without reference to previous statutes and decisions, "trials at common law," in the final clause of the section, might also be held to include trials in criminal, as well as in civil cases.

But the history of congressional legislation and judicial exposition on this subject renders such a construction impossible.

By the Judiciary Act of September 24, 1789, c. 20, § 34, it was enacted "that the laws of the several States, except where the Constitution, treaties or statutes of the United States shall otherwise require or provide, shall be regarded as rules of decision in trials at common law in the courts of the United States in cases where they apply." 1 Stat. 92. Although that section stood between two sections clearly applicable to criminal cases, it was adjudged by this court at December term, 1851, upon a certificate of division of opinion in the Circuit Court, directly presenting the question, that the section did not include criminal trials, or leave to the States the power to prescribe and change from time to time the rules of evidence in trials in the courts of the United States for offences against the United States. Chief Justice Taney, delivering the unanimous judgment of the court, said: "The language of this section cannot upon any fair construction be extended beyond civil cases at common law, as contradistinguished from suits in equity. So far as concerns rights of property, it is the only rule that could be adopted by the courts of the United States, and the only one that Congress had the power to establish.

And the section above quoted was merely intended to confer on the courts of the United States the jurisdiction necessary to enable them to administer the laws of the States. But it could not be supposed, without very plain words to show it, that Congress intended to give to the States the power of prescribing the rules of evidence in trials for offences against the United States. For this construction would in effect place the criminal jurisprudence of one sovereignty under the control of another. It is evident that such could not be the design of this act of Congress." "The law by which, in the opinion of this court, the admissibility of testimony in criminal cases must be determined, is the law of the State, as it was when the courts of the United States were established by the Judiciary Act of 1789." "The courts of the United States have uniformly acted upon this construction of these acts of Congress, and it has thus been sanctioned by a practice of sixty years." *United States* v. *Reid,* 12 How. 361, 363, 366.

In 1862, Congress enacted that "the laws of the State in which the court shall be held shall be the rules of decision as to the competency of witnesses in the courts of the United States in trials at common law, in equity, and in admiralty." 12 Stat. 588. By a familiar rule, the words "trials at common law" in this statute are to receive the construction which had been judicially given to the same words in the earlier statute relating to the same subject. *The Abbotsford,* 98 U. S. 440; *United States* v. *Mooney,* 116 U. S. 104; *In re Louisville Underwriters,* 134 U. S. 488. They have received that construction in several of the Circuit Courts. *United States* v. *Hawthorne,* 1 Dillon, 422; *United States* v. *Brown,* 1 Sawyer, 531, 538; *United States* v. *Black,* 1 Fox, 570, 571. The question has not come before this court, probably because there never was a division of opinion upon it in a Circuit Court, which was the only way, until very recently, in which it could have been brought up.

The provision, "that in the courts of the United States there shall be no exclusion of any witness on account of color, nor in civil actions because he is a party to or interested in the issue tried," was first introduced in 1864 in the Sundry Civil

Appropriation Act for the year ending June 30, 1865, as a proviso to a section making an appropriation for bringing counterfeiters to trial and punishment. Act of July 2, 1864, c. 210, § 3; 13 Stat. 351. That proviso, as already suggested, included criminal cases in the first clause, as distinguished from the second. But it had no tendency to bring criminal cases within the general provision of the act of 1862.

The proviso as to actions by or against executors, administrators or guardians, was added, by way of amendment to section 3 of the appropriation act above mentioned, by the act of March 3, 1865, c. 113. 13 Stat. 533. This proviso had evidently no relation to criminal cases.

The combination and transposition of the provisions of 1862, 1864 and 1865, in a single section of the Revised Statutes, putting the two provisos of the later statutes first, and the general rule of the earlier statute last, but hardly changing the words of either, except so far as necessary to connect them together, cannot be held to have altered the scope and purpose of these enactments, or of any of them. It is not to be inferred that Congress, in revising and consolidating the statutes, intended to change their effect, unless an intention to do so is clearly expressed. *Potter* v. *National Bank*, 102 U. S. 163; *McDonald* v. *Hovey*, 110 U. S. 619; *United States* v. *Ryder*, 110 U. S. 729, 740.

It may be added that Congress has enacted that any person convicted of perjury, or subornation of perjury, under the laws of the United States, shall be incapable of giving testimony in any court of the United States until the judgment is reversed; Rev. Stat. §§ 5392, 5393; and has made specific provisions as to the competency of witnesses in criminal cases, by permitting a defendant in any criminal case to testify on the trial, at his own request; and by making the lawful husband or wife of the accused a competent witness in any prosecution for bigamy, polygamy or unlawful cohabitation. Act of March 16, 1878, c. 37; 20 Stat. 30; Act of March 3, 1887, c. 397; 24 Stat. 635.

For the reasons above stated, the provision of section 858 of the Revised Statutes, that " the laws of the State in which the

court is held shall be the rules of decision as to the competency of witnesses in the courts of the United States in trials at common law, and in equity and admiralty," has no application to criminal trials; and, therefore, the competency of witnesses in criminal trials in the courts of the United States held within the State of Texas is not governed by a statute of the State which was first enacted in 1858, but, except so far as Congress has made specific provisions upon the subject, is governed by the common law, which, as has been seen, was the law of Texas before the passage of that statute and at the time of the admission of Texas into the Union as a State.

At common law, and on general principles of jurisprudence, when not controlled by express statute giving effect within the State which enacts it to a conviction and sentence in another State, such conviction and sentence can have no effect, by way of penalty, or of personal disability or disqualification, beyond the limits of the State in which the judgment is rendered. *Wisconsin* v. *Pelican Ins. Co.*, 127 U. S. 265; *Commonwealth* v. *Green,* 17 Mass. 515; *Sims* v. *Sims,* 75 N. Y. 466; *National Trust Co.* v. *Gleason,* 77 N. Y. 400; Story on Conflict of Laws, § 92; 1 Greenl. Ev. § 376. It follows that the conviction of Martin in North Carolina did not make him incompetent to testify on the trial of this case.

The competency of Spear to testify is equally clear. He was convicted and sentenced in Texas; and the full pardon of the Governor of the State, although granted after he had served out his term of imprisonment, thenceforth took away all disqualifications as a witness, and restored his competency to testify to any facts within his knowledge, even if they came to his knowledge before his disqualification had been removed by the pardon. *Boyd* v. *United States,* 142 U. S. 450; *United States* v. *Jones,* (before Mr. Justice Thompson,) 2 Wheeler Crim. Cas. 451, 461; *Hunnicutt* v. *State,* 18 Tex. App. 498; *Thornton* v. *State,* 20 Tex. App. 519.

Whether the conviction of either witness was admissible to affect his credibility is not before us, because the ruling on that question was in favor of the plaintiffs in error.

7. Another question worthy of consideration arises out of

the omission to deliver to the defendants lists of the witnesses to be called against them.

Section 1033 of the Revised Statutes is as follows: " When any person is indicted of treason, a copy of the indictment, and a list of the jury, and of the witnesses to be produced on the trial for proving the indictment, stating the place of abode of each juror and witness, shall be delivered to him at least three entire days before he is tried for the same. When any person is indicted of any other capital offence, such copy of the indictment and list of the jurors and witnesses shall be delivered to him at least two entire days before the trial." This section re-enacts a provision of the first Crimes Act of the United States, except that under that act the defendant, if indicted for any capital offence other than treason, was not entitled to a list of the witnesses. Act of April 30, 1790, c. 9, § 29; 1 Stat. 118.

The words of the existing statute are too plain to be misunderstood. The defendant, if indicted for treason, is to have delivered to him three days before the trial "a copy of the indictment, and a list of the jury, and of the witnesses to be produced on the trial for proving the indictment;" and if indicted for any other capital offence, is to have "such copy of the indictment and list of the jurors and witnesses" two days before the trial. The list of witnesses required to be delivered to the defendant is not a list of the witnesses on whose testimony the indictment has been found, or whose names are endorsed on the indictment; but it is a list of the "witnesses to be produced on the trial for proving the indictment." The provision is not directory only, but mandatory to the government; and its purpose is to inform the defendant of the testimony which he will have to meet, and to enable him to prepare his defence. Being enacted for his benefit, he may doubtless waive it, if he pleases; but he has a right to insist upon it, and if he seasonably does so, the trial cannot lawfully proceed until the requirement has been complied with. *United States* v. *Stewart*, 2 Dall. 343; *United States* v. *Curtis*, 4 Mason, 232; *United States* v. *Dow*, Taney, 34; *Regina* v. *Frost*, 9 Car. & P. 129; *S. C.* 2 Moody, 140; *Lord* v. *State*, 18 N. H.

173; *People* v. *Hall,* 48 Michigan, 482, 487; *Keener* v. *State,* 18 Georgia, 194, 218.

The provision is evidently derived from the English statute of 7 Anne, c. 21, § 11, by which it was enacted that, "when any person is indicted for high treason or misprision of treason, a list of the witnesses that shall be produced on the trial for proving the said indictment, and of the jury, mentioning the names, profession and place of abode of the said witnesses and jurors, be also given, at the same time that the copy of the indictment is delivered to the party indicted; and that copies of all indictments for the offences aforesaid, with such lists, shall be delivered to the party indicted ten days before the trial and in presence of two or more credible witnesses." Upon a case brought before all the judges of England, in 1840, in which a copy of the indictment and list of the jurors had been delivered to the defendant fifteen days, and a list of the witnesses to be produced on the trial had been delivered to him, ten days before the trial, the defendant, after he had been put upon his trial, and the jury had been sworn and charged with him upon the indictment, objected, upon the first witness being called and before he was sworn, that neither that witness nor any other could be examined, because the list of witnesses had not been delivered to him at the same time as the indictment and the list of jurors, as the statute of Anne required. It was argued for the Crown that the list of witnesses was seasonably delivered, and that, if not, the objection should have been taken earlier. It was held, by a majority of the judges, that the delivery of the list of witnesses was not a good delivery in point of law, but that the objection to its delivery was not taken in due time; and the judges agreed that, if the objection had been made in due time, the effect of it would have been a postponement of the trial, in order to give time for a proper delivery of the list. In the course of the argument, Chief Justice Tindal said: "If no list had been delivered, the Crown could not have called a single witness." *Regina* v. *Frost,* 9 Car. & P. 129, 175, 187; *S. C.* 2 Moody, 140, 158, 170.

The Supreme Court of New Hampshire, in 1846, under a

statute providing that. "every person indicted for any offence, the punishment of which may be death or confinement to hard labor for life, shall be entitled to a copy of the indictment before he is arraigned thereon; a list of the witnesses to be used on the trial, and of the jurors returned to serve on the same, with the name and place of abode of each, to be delivered to him forty-eight hours before the trial," held that an objection to the list of witnesses, for want of due statement of their places of abode, was waived if not taken until after one witness had been called and sworn at the trial. But Chief Justice Parker, in delivering judgment, said that if the defendant's objection was that no list such as the statute requires had been furnished to him, " he may object, when the case is called, to proceeding with the trial until the requisition of the statute is complied with;" and that " undoubtedly it is competent to the respondent, when a witness is called in such a case to be examined against him, to except that such witness is not named in the list furnished to him, for the purpose of excluding the testimony of that witness." N. H. Rev. Stat. c. 225, § 3; *Lord* v. *State*, 18 N. H. 173, 175, 176.

There is no occasion to consider how far, had the government delivered to the defendants, as required by the statute, lists of the witnesses to be produced for proving the indictments, particular witnesses, afterwards coming to the knowledge of the government, or becoming necessary by reason of unexpected developments at the trial, might be permitted, on special reasons shown, and at the discretion of the court, to testify in the case.

In the present case, copies of the indictments, having endorsed on each the names of the witnesses upon whose testimony it had been found by the grand jury, were delivered to the defendants more than two days before the trial. But no list of the " witnesses to be produced on the trial for proving the indictment " was ever delivered to any of them: and forty. witnesses, none of whose names were endorsed on the indictments, were called by the government, and admitted to testify, as of course, to support the indictments and make out the case for the government, without a suggestion of any reason for

not having delivered to the defendants the lists required by the statute.

There is no pretence that there was any waiver on their part of their right to such a list. On the contrary, they took the objection when the case was called for trial, and before the empanelling of the jury ; and they renewed the objection as soon as witnesses whose names were not endorsed on either of the indictments were called and sworn to testify in support of the indictments, and before any of them had given any testimony in the case; and on each occasion they duly took an exception to the overruling of the objection.

The indictments charged the defendants not only with a conspiracy, which was not a capital offence, but also with having, in the prosecution of the conspiracy, committed a murder, which was a capital offence. They could not therefore lawfully be put on trial, against their objection, until at least two days after they had been furnished with a list of the witnesses to be called against them. When they were to be tried for their lives, they had a right to the benefit of the statute, and the refusal to accord it to them was manifest error.

It was contended on behalf of the United States that this error was cured by the verdict acquitting the defendants of the capital charge, and convicting them of the lesser crime only. The argument is that the defendants, having prevailed in their defence against the capital charge, have not been legally prejudiced, because they would not have been entitled to a list of witnesses if they had been indicted and tried on the only charge of which they were ultimately convicted.

It may be doubted whether this is a satisfactory answer to the objection. An indictment for a capital offence usually includes an offence less than capital, and the defendant may be convicted of either. For instance, one indicted of murder may be convicted of manslaughter, or of an assault only. The statute does not make a defendant's right to a list of the witnesses to be called against him depend upon the degree of the crime of which upon trial he is ultimately convicted, but upon the degree of crime for which he is indicted. The list is to be delivered before the trial to " any person indicted of a capital

offence." The objection that these defendants had been furnished with no list of the witnesses was not like an ordinary objection to the competency of particular testimony; but it affected the whole course of the trial, and put the defendants in anxiety and danger of being capitally convicted until the return of the verdict. True, the government might have elected not to indict them for the capital offence, or might perhaps, when the objection to the want of a list of witnesses was first taken, have entered a *nolle prosequi* of so much of the indictment as contained the allegations necessary to make out that offence, and unnecessary to constitute the lesser crime of conspiracy, and have thereupon proceeded to trial without delivering any list of the witnesses. But the government, having elected to indict and to try the defendants for the capital crime, may well be held bound to afford them those means of preparing their defence, which the statute required, and which, had they been furnished, might perhaps have enabled the defendants to secure a complete acquittal of everything charged against them. The case bears some analogy to that of a defendant held to answer for an infamous crime without presentment or indictment of a grand jury, of which this court has said : " The question is whether the crime is one for which the statutes authorize the court to award an infamous punishment, not whether the punishment ultimately awarded is an infamous one. When the accused is in danger of being subjected to an infamous punishment if convicted, he has the rignt to insist that he shall not be put upon his trial, except on the accusation of a grand jury." *Ex parte Wilson,* 114 U. S. 417, 426.

It is unnecessary, however, in this case, to express a definitive opinion upon the question whether the omission to deliver the list of witnesses to the defendants would of itself require a reversal of their conviction and sentence for less than a capital offence, inasmuch as they are entitled to a new trial upon another ground.

8. The court went too far in admitting testimony on the general question of conspiracy.

Doubtless, in all cases of conspiracy, the act of one conspir-

ator in the prosecution of the enterprise is considered the act of all, and is evidence against all. *United States* v. *Gooding*, 12 Wheat. 460, 469. But only those acts and declarations are admissible under this rule, which are done and made while the conspiracy is pending, and in furtherance of its object. After the conspiracy has come to an end, whether by success or by failure, the admissions of one conspirator, by way of narrative of past facts, are not admissible in evidence against the others. 1 Greenl. Ev. § 111; 3 Greenl. Ev. § 94; *State* v. *Dean*, 13 Iredell, 63; *Patton* v. *State*, 6 Ohio St. 467; *State* v. *Thibeau*, 30 Vermont, 100; *State* v. *Larkin*, 49 N. H. 39; *Heine* v. *Commonwealth*, 91 Penn. St. 145; *Davis* v. *State*, 9 Tex. App. 363.

Tested by this rule, it is quite clear that the defendants on trial could not be affected by the admissions made by others of the alleged conspirators after the conspiracy had ended by the attack on the prisoners, the killing of two of them, and the dispersion of the mob. There is no evidence in the record tending to show that the conspiracy continued after that time. Even if, as suggested by the counsel for the United States, the conspiracy included an attempt to manufacture evidence to shield Logan, Johnson's subsequent declarations that Logan acted with the mob at the fight at Dry Creek were not in execution or furtherance of the conspiracy, but were mere narratives of a past fact. And the statements to the same effect, made by Charles Marlow to his companions while returning to the Denson Farm after the fight was over, were incompetent in any view of the case.

There being other evidence tending to prove the conspiracy, and any acts of Logan in furtherance of the conspiracy being therefore admissible against all the conspirators as their acts, the admission of incompetent evidence of such acts of Logan prejudiced all the defendants and entitles them to a new trial.

Upon the other exceptions taken by the defendants to rulings and instructions at the trial we give no opinion, because they involve no question of public interest, and may not again arise in the same form.

*Judgment reversed, and case remanded to the Circuit Court, with directions to set aside the verdict and to order a new trial.*

Mr. Justice Lamar did not concur in the opinion of the court on the construction of section 5508 of the Revised Statutes.

Mr. Justice Brewer was not present at the argument, and took no part in the decision of this case.