WOLFSON v. UNITED STATES.

(Circuit Court of Appeals, Fifth Circuit.  May 10, 1900.)

No. 770.

For majority opinion, see 101 Fed. 430.

BOARMAN, District Judge (dissenting). The two defendants, Leefe and Wolfson, were tried on the same indictment, and before the same jury; each of them having different counsel. Each of the numerous counts in the indictment charges and shows a distinctive, substantive crime. A number of the counts charged such crimes as occurring dehors the statute of limitation. All of these counts were nolle prosequied. In considering the reasons herein given for dissenting in this case, it will be necessary to keep in mind that this is not a case in which Wolfson, one of the co-defendants, could be found guilty unless the evidence also convicted Leefe, the principal.

I think it will be conceded that the evidence, a full report of which we have before us in the record, shows: First, that the government, up to the moment Moxey was permitted to give the testimony to which objection was unsuccessfully made by defendant Wolfson (Leefe not joining in this objection), had offered no evidence incriminating Wolfson in the case on trial; secondly, that the government's evidence, up to the time Leefe was allowed to testify against the objection of Wolfson, was equally as free from incriminating circumstances against Wolfson. I think it will be further conceded, under the well-established jurisprudence relating to criminal trials, that if the government had, before the time that Moxey was allowed to answer the objectionable questions, rested its case, the court, on motion of defendant Wolfson, would have readily discharged him from the case. The same may be said as to the right of Wolfson to be discharged at or before the time Leefe was permitted to give his testimony. At neither of these periods could a conviction have been had on the government's evidence against either Leefe or Wolfson. Under the jurisprudence relating to the practice in criminal trials, Wolfson, I think, had a legal right at either of those periods to move for his discharge from the case, and to have deprived him of such a right by cutting him off from exercising it was error.

I think the evidence of Moxey, to which objection was urged, should not have been admitted: First, because it related to substantive offenses which occurred, if they occurred at all, dehors the period of limitation; and because it was directed to the purpose on the part of the government (though this purpose is denied by counsel for the government) of proving that defendant Wolfson was guilty, or had been antecedently guilty, of a distinctive, independent, extraneous crime, which crime, if committed at all by defendant, was begun and completed so as to subject him to indictment before the day when prescription began to run in his favor. The statute of limitation, it is conceded, began to run on the 21st day of April, 1894. The statute is as follows:

"No person shall be prosecuted, tried or punished for any offense not capital * * * unless the indictment is found or information is instituted within three years after such offense shall have been committed." Rev. St. § 1044.

It was conceded on the argument that the testimony of Moxey, if true, showed conclusively that Wolfson had committed an independent, extraneous crime antecedently to the above date.

The rule as to prescription or limitations seems to be founded on public policy. Such policy suggests two reasons why a defendant, even though the facts in the case might show, antecedently to said date, that he had committed such a crime and acts as would, in law, incriminate him in an indictable offense, should not be "prosecuted," "tried," or "punished" for such substantive crime after the time fixed in the statute had elapsed. The basic principles on which the moral reason of the rule is founded, I suggest, rest on our common knowledge of things. The reason of the rule suggests that with a lapse of time men often give up evil-doing and become more law-abiding citizens; and, secondly, that, after the lapse of the time fixed by the statutes, the courts, because of the infirmity of human methods and

things, become less efficient in their purpose to fairly administer the law between the state and the defendant. A purpose, too, of the rule seems to be that the law, after the lapse of the time fixed, is disposed to pardon and condone such independent offense. With the lapse of time fixed by law, the presumption of innocence, as to a crime occurring dehors the statute, ripens into a legal conclusion of innocence of such substantive offense. Considering these reasons, it may be said to be the general rule that a defendant in a pending trial, after the lapse of the period of limitation, earns by operation of law an absolute indemnity from judicial prosecution, trial, or punishment for any extraneous crime in which the government might show he may have been implicated. Under the general rule, founded upon public policy, the law, in a sense, condones or pardons him, not only for the offenses which he may have committed antecedently to such fixed time, but guaranties him indemnity from any damage or injury that might come to him if he should be on trial for some offense committed within the period of limitation. To be tried, means that a person has had a trial under legal methods. A fair view of the legal effect of the statute we have cited forbids anything relating to any extraneous crime to be used in the pending trial which may aid the purpose of the government to convict such defendant in a pending case. The indemnity invested in the defendant by lapse of time is not diminished because it may be that the extraneous crime was a similar one to the offense on trial. Notwithstanding the statute of limitations, it is argued that testimony as to an extraneous crime committed at any time, if such crime be similar to the one for which the defendant is on trial, is relevant, and should be admitted, because it is a part, or may be, of the res gestæ, or because it may show to the jury trying the case the intention with which the defendant may have done the criminal acts for which he is on trial. So far as I am advised, the United States courts have never considered the legal effect of the statute of limitation as to the admission of testimony against a defendant in a criminal case to show he was implicated in an extraneous crime occurring antecedently to the day the statute began to run in his favor; nor have I been able, in an extensive examination of the state authorities, to find therein authority for allowing the testimony offered by the government, for any reason, to show the defendant's connection in or with an independent, extraneous crime occurring antecedently to the running of the statute of limitation. There are some cases reported from both jurisdictions showing that testimony has been admitted to show that a defendant was implicated in a crime similar to the one for which he was being tried, when such crime was committed about the time alleged in the indictment; but in none of them, so far as I have seen, is the question we are now considering there discussed. The state statutes of limitations usually employ language not so liberal in its indemnities to the defendant as is found in the federal statutes. The Texas statute of limitations briefly forbids "an indictment * * *" in certain cases "to be presented within" so many years. The statute of limitations of Louisiana is along the same line. The other several states, so far as I have examined them, have similar statutes to those I have quoted. Decisions of

the state courts on the question I am considering would, of course, be based on the language of their statutes of limitation. Such decisions would be advisory or persuasive, but not at all controlling, in the matter I am discussing. The United States statute forbids a person to be "prosecuted," to be "tried," or to be "punished" for an offense committed dehors the statute. In the absence of authority to the contrary, I think a fair interpretation of the words "prosecuted," "tried," and "punished," when they are considered in relation to the reasoning and philosophy on which the rule of limitation is founded, and in relation to the common-law rules of evidence, which are grounded on the principles which secure for defendants a fair trial under well-established legal methods, authorizes the suggestion that the legal effect of the statute is to run a line dividing, radically, as to the defendant on trial, his past from the present, and to say to him that he has, in the philosophy and reason of the law, by the lapse of time, earned an absolute indemnity, so far as the government is concerned, from having anything said or done in its courts, for any purpose, as to any extraneous crime in which he may have been antecedently thereto implicated.

The testimony of Moxey as to objectionable extraneous matters was earnestly objected to by Wolfson's counsel on the ground that the government could not, for any purpose, in the pending case, go behind the line which in law divides the present from the past of the defendant. The district attorney urged that the evidence as to substantive crimes dehors the statute, ex necessitate rei, should be admitted, so that he would be able, after proving such crimes, to prove the fraudulently false condition of Wolfson's account on a day within the prescriptible time. It was contended by him, notwithstanding the bank's books on the 21st day of April, 1894, showed a credit in Wolfson's favor, that as a matter of fact on that day he was a fraudulent debtor to the bank, and had no funds to his credit therein upon which he could lawfully draw. In order to prove this contention, the court allowed Moxey, after saying that Wolfson's account was apparently not overdrawn upon the said day, to state, substantially, that as a matter of fact it was largely overdrawn by him, and that he was in fact a fraudulent criminal debtor, and not a creditor, of the bank. Moxey was allowed further to say, substantially, that Wolfson had repeatedly been guilty, antecedently to that day, of feloniously overdrawing his account with the bank; that he had often committed distinctive, completed, extraneous crimes similar to the crime for which he was then on trial. If Moxey's testimony was true, it follows, of course, that Wolfson was criminally implicated in, or guilty of, such extraneous crimes. It appears that the trial judge zealously endeavored to keep Wolfson from being "prosecuted" or "tried" for such extraneous crimes, and sought earnestly to forbid the jury to enter upon the trial of him for any such offenses; but was it within the possibilities of judicial suggestion, under the proceedings that were then going on, to forbid him to be "tried," if not "punished," for the extraneous crimes about which Moxey testified? In the very nature of things, whether we judge from the matters and things that were then going on in the court in the pending trial, or from our knowledge of the effect that

such testimony would have on the jury, the hurtful fact remains that the facts as to the extraneous crimes were being heard and "tried" contradictorily in the pending case. The district attorney urged that Wolfson's account had "to be taken as a whole"; inferring that the crime, though the indictment sets up counts charging distinctive crimes, was a continuous one, and that if he was not allowed to proceed in that way, notwithstanding the statute of limitation, "the defendant would be done injustice, and that it would be utterly impossible, by the nature of the case, to prove it." Clearly the prosecuting attorney meant to prove Wolfson's guilt by showing the very extraneous crimes which were charged in the several counts, and which he had "nolled" because the acts charged therein occurred before the said date. It is clear that, if he meant to do so, he must enter upon a trial contradictorily with the defendant upon the question as to whether Wolfson was guilty, or had been implicated in the extraneous crimes similar to the one for which he was on trial. The only way the government could show that Wolfson was guilty, or implicated in the extraneous crimes, was, under the trial methods in court, to show it contradictorily by legal and satisfactory evidence. For what use or for what purpose, to be served in the pending trial, did the United States attorney zealously endeavor to have such testimony given to the jury? His only legal purpose must have been to learn, by satisfactory proof, whether or not Wolfson, as a matter of fact, had, antecedently to the fixed date, committed such extraneous crimes, so that the result of the trial thereon, if against Wolfson, might be valuable to the jury in determining the matter of intention. Such proof could be used or made relevant in the pending case only after the defendant was criminally connected with the extraneous crime by legal evidence. The difficulties the government's counsel was contending against, it appears to me, were difficulties inherent in the nature of the case; and he sought to prove by methods, as I think, unwarrantable in law, a case that otherwise, as he suggested, it may have been impossible to prove against the defendant Wolfson. In this effort he seems to have had the approval of the judge, who zealously, in his suggestions, on admitting the testimony to the jury, endeavored to forbid the jury to try Wolfson on the issue as to the extraneous crimes. Our everyday, commonplace knowledge of men and things suggests unerringly that the admission of the testimony on which the guilt vel non of Wolfson in the extraneous crimes was determined imperiled the opportunity of the defendant Wolfson to enjoy a fair trial under legal methods in the criminal prosecution against him.

Considering these matters further, it will be seen that there are two material elements in the crime charged against Leefe and Wolfson, viz.: The commission of the act itself, of overdrawing, and the felonious intention in committing such act. The mere act of overdrawing his account would not be criminal in Wolfson. To incriminate Wolfson in the acts of Leefe, it must be shown that the overdrawing was fraudulently effected against the bank, and that the principal and accessary acted, in the overdrawing charge, in the exercise of a felonious intention common to both of them. It matters not at what time the felonious intention came into the mind and purpose

cf both or either of them to do the criminal acts charged in the in-dictment. No crime was committed by either or both of them until the act of fraudulently overdrawing was committed. Every over-drawing, in itself, with such intention, made up a substantive, com-pleted crime. Of course, the fraudulent act of overdrawing followed the felonious intention. The formation of the intention to plunder the bank might have existed a short or a long while before the crim-inal acts could be charged against Wolfson, but an indictment cannot be founded merely on criminal intention. The acts or things done by either of the defendants which merely show the beginning or active life of an intention in the defendants to plunder the bank, whether or not such acts or things were done antecedently to the running of the statute, may, if not too far remote, be relevant testimony to show circumstantially the intention with which the criminal act charged may have been done. The prosecution may show facts occurring dehors the statute which in themselves reasonably suggest the exist-ence of an intention to do or carry out a criminal act, where the act itself was committed within the statute; but I do not think, for any purpose, the government should be allowed to go behind the line drawn by its statute of limitation to prove by trial evidence a crim-inal act itself against the defendant.

Cases in which the legal effect of the statute of limitations was not at issue or discussed can be readily cited, from the reasoning in which authority may be deduced for allowing the prosecution to offer evidence to show that a defendant answering to a charge of counter-feiting, say, "did at or about" the day laid in the indictment pass similar spurious coin upon other persons. Of course, this could for no purpose be shown until after, in the pending trial, the defendant was by sufficient evidence criminally implicated in the material mat-ters for which he was being tried. After defendant was criminally implicated in passing spurious coin at a time within the statute, it would be competent for the prosecution to show that he had in his possession spurious coin at a time dehors the statute. Similar cases, too, may be cited, from the reasoning in which authority may be de-duced to allow the prosecution in the trial, say, of a person for horse-stealing at a date fixed in the indictment, to offer testimony to show that the defendant was seen frequently at or about the barn or lot from which the horse was taken before the statute began to run; for being frequently at the barn, even with an intent to steal, whether be-fore or after the date the statute began to run, is not a criminal act. Taking the horse, within the statute, with felonious intention, makes the material element of the crime. To allow the prosecution to offer evidence to prove in such a case, contradictorily with the defendant, that he was often antecedently at the barn, or that he was seen ante-cedently with a halter similar to or the one found on the stolen horse, could not be objected to on the ground that testimony showing an extraneous substantive crime was sought to be offered by the prose-cution; but if the person on trial had, as a matter of fact, stolen a horse, and therein committed a completed, felonious act, the line of reasoning I have suggested would forbid the government to offer tes-timony, for any purpose, to show incriminating circumstances against

the defendant, which in their legal effect would prove that he had stolen a horse, even from the same prosecuting witness, antecedently to the beginning of the statute of limitations. Under this view, it would follow that the prosecution should not have been forbidden, on the trial of Wolfson for feloniously overdrawing his account, to show any of his acts with Leefe, or things done collusively by either of them in a common purpose to plunder the bank, when such acts or things merely showed an intention or preparation to commit the act of overdrawing for which he was on trial.

Putting aside the reasons I have given to show error in allowing Moxey to testify to substantive, extraneous crimes occurring antecedently to the statute, I think there is another reason why the trial judge should have forbidden Moxey's testimony to be heard, for any purpose, at the particular time he was asked the objectionable question. It is conceded that at the time Moxey was allowed to show incriminating facts as to the extraneous crime there was, as a matter of fact, no evidence of any kind showing that Wolfson had criminally overdrawn his account, as charged in the pending case; that is, there was nothing at that time to show Wolfson's guilt under the indictment. Under the jurisprudence relating to the admission of evidence in criminal cases, it is clearly established, as a general rule, that "it is a violation of the fundamental sanctions of our law to admit evidence that the defendant committed one offense in order to prove that he committed another." Whart. Cr. Ev. §§ 37, 38, 48. We are not permitted, while trying the case against Wolfson, to go backward; that is, find him guilty of the last extraneous offense, and then take that as a factor to establish his guilt in the matter directly in judgment. Before evidence against the defendant relating to a substantive, extraneous crime can be offered by the government for any purpose, the text-books, as well as the authorities in cases in which such matters are put in issue, clearly show that the ground must be first laid, implicating the defendant in the case on trial, and, unless sufficient evidence of this has been received, all evidence of other substantive, extraneous offenses, even to prove intent or systematic purpose to commit similar crimes, must be excluded. The extraneous crime cannot be put in evidence without first proving, contradictorily with the defendant, that he was concerned in the commission of such crime. When that has been shown the prosecution may offer such evidence as may show his guilt therein, for the purpose of showing a systematic purpose on the part of the defendant to commit such crimes, or to show the intention with which the acts proven in the pending case may have been committed. The rules I have stated, substantially, are found in Wharton's Criminal Evidence, beginning at section 31 et seq., and authorities cited therein; and they are amplified in the case of Williams v. State, 38 Tex. Cr. R. 129, 41 S. W. 645. The court therein cites text-books and authorities extensively, as well from other states as from Texas. I have found no United States authorities in which the point is considered.

When the testimony of Moxey relating to extraneous crimes in which the government sought to implicate Wolfson was being offered, the trial court should not, under my view of the authorities cited, have

allowed such evidence to go to the jury, because Wolfson, so far as the evidence then disclosed, was not shown to be guilty of having criminally overdrawn his account, no evidence having been offered to show any such guilt. Moxey, in answering the objectionable questions, said Wolfson was, on the day fixed, a debtor, though the books showed him then to be a creditor, of the bank. This answer, if true, shows that Wolfson had merely overdrawn his account, but the answer itself did not implicate Wolfson in any crime. As a matter of fact, it cannot be said that his answer, taken together with the bank books, in which Wolfson's account was kept by the principal, Leefe (there being antecedently to the time the question was asked no testimony showing any fraudulent act of either Leefe or Wolfson), did satisfactorily establish the guilt of Wolfson in the pending case. Granting that the testimony as to extraneous crimes was not offered for the purpose of proving Wolfson's guilt in the pending case, and that the court did not admit it for that purpose, it must be conceded that it could have had at the time no other legal effect, either morally or legally, in the pending case. The court in its opinion cites two cases supporting the well-established right of the prosecution to offer evidence which shows the intention of the defendant, where such intention is material, but the authorities cited therein do not militate against the effect of the rule cited above; that is, that "it is a violation of the fundamental sanctions of our law to admit evidence that the defendant committed one offense in order to prove he committed another." There are exceptions to this rule, as shown in the text writers, as well as in the decisions involving matters of this rule; but in no case where such exceptions were considered have I found authority for allowing testimony as to substantive extraneous crimes to be offered for any purpose until after the prosecution has established by sufficient proof the commission of the acts charged in the indictment. In none of the authorities cited in the court's opinion does it seem to have been necessary for the court to have considered and passed on the legal effect of the exceptions I have just cited, and which are so well established in the text-books and authorities. The court cites the case of Wood v. U. S., 16 Pet. 342–360, 10 L. Ed. 994, in which it is said that:

"Where the intent of a party is matter in issue, it has always been deemed allowable, as well in criminal as in civil cases, to introduce evidence of other acts and doings of the party of a kindred character, in order to illustrate or establish his intent or motive in the particular act directly in judgment."

The opinion just cited does not discuss a criminal case. The suit therein considered was a libel of information in rem to forfeit goods illegally entered in the custom house. The evidence was not objected to because it tended to prove one crime by showing defendant's guilt in another, nor was it objected to because it was offered at a time in the pending case when nothing had been shown to incriminate the defendant in the matter directly in judgment. It was offered by the government to show that the defendant had antecedently made fraudulent, but not criminal, entries. The opinion of the court cites the case of Moore v. U. S., 150 U. S. 57, 14 Sup. Ct. 26, 37 L. Ed. 996. In that case it is said:

"The government relied mainly on circumstantial evidence tending to show that the defendant was also guilty of the murder of a man named Camp."

Objection was interposed to that part of the evidence. Mr. Justice Brown, speaking for the court in that case said (page 61, 150 U. S., page 28, 14 Sup. Ct., and page 998, 37 L. Ed.):

"The fact that the testimony also had a tendency to show that the defendant had been guilty of Camp's murder would not be sufficient to exclude it, if it was otherwise competent."

The words "if it was otherwise competent" disclosed the thought that was in the mind of Mr. Justice Brown, and support the suggestions I have made as to the inadmissibility of the testimony before Wolfson's guilt was established in the pending case. Until his guilt was established in the pending case, the testimony would be incompetent, and such testimony as the justice was discussing could not be competent until after incriminating circumstances against Wolfson were established. Clearly, it was not necessary for the supreme court, in considering those two cases, to pass upon the legal effect of the exception to the general rule I have cited above. The exception was not invoked in either case, nor was it useful or pertinent to illustrate the objection the justice was considering. The court says:

"The jury were instructed as to this purpose, and were informed that it was not offered and could not be used for the purpose of convicting defendants of offenses for which they were not on trial. The fact that this evidence tended to prove another crime does not, as we have seen, exclude it. The fact that the prosecution relied upon facts offered in evidence that would have been barred by the statute of limitations is immaterial. If the evidence was relevant, it was not affected by the lapse of three years from the occurrence."

The court had in mind only the objection as to the effect of the statute of limitations. It will be seen in the opinion that no consideration was given to the rule or to the exceptions to the rule which I have cited. This rule itself, and its effect, may have been in the mind of the court in a general way, as it seems to have been in the mind of the trial judge, but in the court's opinion there is no consideration given to the effect of the exceptions which are as well established as the rule itself. Under such exceptions it follows that the testimony of Moxey was prematurely offered, and should have been rejected, because at the time it was offered the ground was not first laid implicating the defendant in the case on trial. The fact that the evidence of Moxey, in the opinion of the court, was in itself relevant, seems to have been sufficient cause for allowing Moxey's evidence to be heard against Wolfson, notwithstanding the statute of limitation, and the force of the rule, with the exceptions thereto, relied upon by Wolfson's counsel. The bank books show that Wolfson was a creditor—had funds in the bank—on the 21st day of April, 1894. The government itself offered the books, but contended they were false as to Wolfson's account, and proposed to show this by Moxey's evidence. The objection, in my view, was not to allowing the government, at the proper time and by competent evidence, to show that the books had been falsely kept by Leefe (this was shown later on by Leefe's evidence), and that Wolfson knew he had in fact no funds to his credit, and could not lawfully draw on the bank. The government might

have been permitted to prove such knowledge on Wolfson's part, and the circumstances as to the false books could have been used against him, to show his intention in overdrawing his account. Such evidence, if it had been addressed and limited singly to that purpose, should have been admitted. Going beyond this, Moxey was allowed to show that Leefe had frequently allowed Wolfson to fraudulently overdraw his account, and that he covered up such overdrafts by false entries. I think, under the rules of evidence now under discussion, the objection made to Moxey's testimony should have been sustained because it was prematurely offered. When Moxey was sworn, nothing incriminating Wolfson had been shown by the government. Later on, when the court (as I think, erroneously) allowed Leefe, as a witness against Wolfson, to show his own criminality in keeping the books, and Wolfson's conspiracy with him to share in the criminal purpose, Moxey's evidence could have been admitted to supplement Leefe's confession that he had fraudulently kept the books, and that Wolfson was also guilty in the matter directly in judgment. Until after Leefe's testimony was given to the jury, incriminating himself and Wolfson, Moxey's evidence should not have been permitted for any purpose. Leefe's testimony proved that the books had been fraudulently kept by himself, and that Wolfson knew that he was fraudulently overdrawing his account. Until Leefe gave his testimony, nothing had been shown by the government incriminating either himself or Wolfson.

Before discussing the error assigned as to the admitting the testimony of Leefe, I quote from the record, to show the attitude of the case when he was admitted to be sworn: Counsel, after urging his objection, said:

"I ask the court to rule now, unless he [Leefe] is called as a witness on the part of the government, that the testimony be deferred until the defense is called upon to put its testimony in before the jury. By the Court: Has the government closed? By Mr. Theard [counsel for Leefe]: I have offered him freely, to be used by the government if the government sees fit. By Mr. Rouse [counsel for Wolfson]: Does the government call him? By Mr. Gurley [United States attorney]: The government accepts the request, and will examine him as a witness of the government at this time. By the Court: Swear the witness, Mr. Clerk."

Nothing occurred in the further colloquy between the court and counsel to change substantially the matter disclosed in the questions and answers cited from the record. It is clear from this colloquy that the government, at the time Leefe was sworn, had not closed its case. The trial judge asked, "Has the government closed?" No response was made to this inquiry. Leefe's offering himself as a witness for the government if it saw fit to use him was made while the government's case was being heard. The court seems to be of the opinion that the colloquy shows only an irregularity; that it was, as a matter of fact, of no material importance whether Leefe was permitted to give his evidence then, before the government evidence was closed, or later on, after defendant's side was taken up. In view of the evidence he gave, it was not material to him, because he could as well then as later on be heard to make a confession as to his own guilt; but the irregularity was fatally damaging to Wolfson, because

up to the time Leefe was tendered as a witness by his counsel for the use of the government, and the United States attorney proceeded to "examine him as a witness for the government at this time," there was no evidence implicating Wolfson in the matter directly in judgment. The effect, substantially, of the evidence adduced under the examination made by the United States attorney of the witness, freely tendered for the government's use, was that Wolfson was convicted by the confession of Leefe, who was on trial under the same indictment with Wolfson. It will be seen that Leefe was permitted to be sworn as a government witness over the objection made by Wolfson's counsel. The court said:

"The common-law rule of evidence is that, when two persons are jointly indicted and put upon trial before the same jury, neither can be a witness for or against the other unless the interest of the one so called has been terminated by an acquittal, conviction, or nolle prosequi."

The authorities, without exception, sustain this view; but the court says the rule just mentioned is abrogated, and in this court it is not to be considered, because the matter in contention is one of statutory construction, and quotes the United States statute of 1878. The court says this statute makes Leefe a competent witness at his own request; that, notwithstanding the common-law rule cited by the court, he should be heard to give testimony against the accessary, Wolfson, though both were on trial under the same indictment before the same jury. The court suggests that:

"This statute, in terms, makes the defendant a competent witness. The statute does not say 'a competent witness for himself.' It does not say 'a competent witness for the government.' He is simply made, at his own request, but not otherwise, a competent witness."

Certainly there was no power, even though he was a competent witness, in the statute authorizing the government's counsel at any time during the progress of the trial to call and appropriate Leefe as a witness for the government against Wolfson. A competent witness is a person allowed to be sworn in a pending case,—to give legal testimony therein under the rules of evidence. All that can be claimed for the statute is that Leefe, if permitted at all, under the rules of evidence, to be sworn, was made, by its terms a competent witness. However competent the statute might have made him, Wolfson, the accomplice, could not have called him as a witness; nor could he on his own motion, or at the instance of the government, become a witness against Wolfson. The history of the case shows that no conviction could have been had against Wolfson at all, but for the testimony of Leefe, because, up to the time he was offered, no incriminating facts had been stated by any witness against Wolfson. Leefe never requested to become "a witness in his own behalf." It seems to have been the purpose of congress to allow a defendant to become a witness "in his own behalf upon his request." "In mercy to him, he is, by the act in question, permitted, upon his request, to testify in his own behalf in the case." Wilson v. U. S., 149 U. S. 66, 13 Sup. Ct. 765, 37 L. Ed. 650. The statute says a defendant may be a competent witness at his own request. The United States courts, in considering the words "at his own request," have treated them as

if they meant in his own behalf. The view taken by the federal courts of the statute of 1878, as shown by the federal authorities, is different from the ruling of the state courts on similar statutes. The law and rules of evidence in the state jurisdiction do not control United States courts as to the competency of witnesses or as to the admissibility of evidence therein in criminal cases. Logan v. U. S., 144 U. S. 263, 12 Sup. Ct. 617, 36 L. Ed. 429. The common law rules of evidence, obtaining when the judiciary act of 1789 was passed, are the rules under which United States courts now test the competency of witnesses and the admissibility of evidence. Those rules remain in full force unless changed by statute, and there is no authority or reasoning therein to show that the act of 1878 has impaired the common-law rule forbidding the principal to be appropriated by the government as a witness against his accomplice when both are on trial under the same indictment. The competency of the defendant, under the act of 1878, in a criminal case, to give testimony, and the admissibility of such testimony, are to be determined by the rules of evidence that apply to other competent witnesses. The only case I have found in which the United States court considered and passed upon the question as to how far the statute of 1878 is affected by the common-law rules of evidence is reported in U. S. v. Hollis (D. C.) 43 Fed. 248. The court therein said:

"The act of the 16th of March, 1878, provides that a defendant charged with crime shall at his own request, but not otherwise, be a competent witness; that is, he shall not labor under disabilities because he is a party in interest, and notwithstanding this may testify. But, when a party offers himself as a witness in his own behalf, he must be treated as any other witness, and subject to any exceptions that would apply to any other witness. In other words, the act frees him from such disability."

In the state decisions, it may be said, a more liberal view has been announced. Under such decisions the views of the court might be established. The effect of the United States statute is limited to making the defendant a competent witness to testify in his own behalf. It does not abrogate as to him all the rules which at common law qualify and limit the testimony of other competent witnesses. Wolfson is charged with a crime against the United States. He is entitled to a trial under the common-law rule, which forbids the testimony of a principal to be appropriated by the government against his accessary when both parties are on trial at the same time under the same indictment. The court says:

"We think the statute made Leefe a competent witness at his own request. To construe it otherwise would do violence to its plain words, and would defeat the legislative intent."

In support of this suggestion the court cites no United States authorities in which the effect of the common-law rule, taken together with the act of 1878, is considered, but relies upon a liberal quotation from state authorities. The state authorities are at variance on the subject, and are not in line with the rule so far as it has been laid down in the federal courts in any case where the matter at issue

102 F.—10

was involved. The court cites the case of Benson v. U. S., 146 U. S. 325, 13 Sup. Ct. 60, 36 L. Ed. 991, but says it is not strictly in point, because in that case there had been a severance, and only one defendant was on trial. The court's use of this authority is like the play of the Prince of Denmark with Hamlet left out. In the Benson Case the defendant alone was on trial, and the common-law rule prohibiting a principal being called as a witness when he and his accessaries are on trial before the same jury was not varied by anything that was ruled upon in that case. Antecedently to the act of 1878 a defendant on trial by himself was, under the common law, incompetent, because of interest, to testify to relevant matter in his own behalf, for any purpose, in the case. Whether a defendant is on trial by himself alone, or whether he is on trial as a principal with his accessary, under the same indictment, the act of 1878 makes either of such defendants a competent witness to give testimony under the common-law rules of evidence obtaining at the time of the act. If Leefe, as principal, and Wolfson, as accessary, had been on trial antecedently to the act of 1878, there were then two common-law rules of evidence which would have made Leefe incompetent to testify against Wolfson. If he had been offered as a witness, he would have been "arrested at the book," because of the legal effect of those two rules: First, he could not have been sworn because he was a party in interest; secondly, he could not have been sworn because he was on trial as a principal with his accessary, under the same indictment, before the same jury. Each one of these two rules of evidence rests on different reasons. The first one suggests its own reason. The second rule rests in public policy. After the act of 1878 neither of them, if seasonably offered as witnesses, could have been "arrested at the book." They would have been sworn, but in the process of their examination, as competent witnesses, they would have been subjected to the rules that would have qualified or limited or have been applicable to the evidence of any other competent witness. It was not the purpose of the act, in removing a disability resting on the ground of interest, to relieve Leefe from other rules of evidence resting on public policy, and applicable to the conditions of the case in which he was being tried. Certainly, at no time, whether on the trial or antecedently to the trial, could Leefe have made a confession which would have been heard to convict his accomplice, Wolfson. It would not be a fair construction of the law to say that the act, which was intended to remove a defendant's incompetency resting on the fact that he was a party in interest, should be allowed to operate so as to violate the right of Wolfson under the common law to forbid Leefe's testimony, which in fact was substantially a confession made by himself against Wolfson. It had that effect in bringing about a conviction of Wolfson. Considering the matter of admitting Leefe's testimony, under the conditions of the case quoted from the record, it occurs to me that the trial judge, if authorized at all to admit Leefe's testimony, or let it be appropriated by the government at the time his counsel "freely" offered him as a witness, should have said to Leefe, substantially:

"You may now give your testimony under the act of 1878 if you choose to do so; but, under the rules of evidence, to the benefit of which Wolfson is entitled, your evidence will be limited to a denial or admission of your guilt. You cannot give any testimony against Wolfson. If you choose, you can give testimony for yourself or against yourself, or you can now make a confession of your own guilt in the presence of the court, just as you could have made it elsewhere; but nothing you can say will be taken against Wolfson."

I think, to allow any other view to obtain, under the conditions of the case, would, in effect, be to refine away Wolfson's right to a fair trial under the common law as it existed when the judiciary act of 1789 was passed.

"The reason for the exclusion of husband and wife when called for or against the other being social policy, and not interest, statutes abolishing incompetency resting on interest do not remove the common law of incompetency of husband and wife for or against the other." Whart. Ev. par. 431, and numerous cases cited thereunder.

In Lucas v. Brooks, 18 Wall. 436, 21 L. Ed. 779, the court says, in discussing the admissibility of a wife's evidence in a case where the husband is the party in interest:

"But, it is argued, because congress has enacted that in civil actions in the courts of the United States there shall be no exclusion of any witness because he is a party to or interested in the issue tried, the wife is competent to testify for her husband. Undoubtedly the act of congress has cut up by the roots all objections to the competency of a witness on account of interest. But the objection to a wife's testifying on behalf of her husband is not, and never has been, that she has any interest in the issue to which he is a party. It rests solely upon public policy. To that the statute has no application. Accordingly, though statutes similar to the act of congress exist in many of the states, they have not been held to remove the objection to a wife's competency to testify for or against her husband."

By analogy, this quotation sustains the contention that the legal effect of the act of 1878 is to relieve a defendant of disability on the ground of interest, but that the common-law rule of evidence as to inadmissibility of a principal's evidence, quoted and sanctioned by the court in this case, is founded on public policy, and is not abrogated by the legal effect of the act of 1878. That statute removes the disqualification of a witness by reason of interest, but does not remove such disqualification as is shown in the authorities to rest "solely on public policy." Mitchinson v. Cross, 58 Ill. 367, and American and English cases cited thereunder; Ney v. Swinney, 36 Ind. 455, citing numerous cases.