**UNITED STATES of America, Appellee,**

v.

**Hildur L. NYSTROM and Samuel A. Kennedy, Appellants.**

Nos. 11669–11672.

United States Court of Appeals
Third Circuit.

Argued June 19, 1956.

Decided Sept. 20, 1956.

Rehearing Denied Oct. 26, 1956.

Charles J. Margiotti, Pittsburgh, Pa. (Margiotti & Casey, Pittsburgh, Pa., and H. Turner Frost, McKeesport, Pa., on the brief), for appellants.

Oliver Dibble, Washington, D. C. (Warren Olney III, Asst. Atty. Gen.; D. Malcolm Anderson, Jr., U. S. Atty., Western Dist. of Pennsylvania, Pittsburgh, Pa., Robert G. Maysack, Atty., Criminal Division, Washington, D. C., on the brief), for appellee.

Before GOODRICH and McLAUGH-LIN, Circuit Judges, and VAN DUSEN, District Judge.

McLAUGHLIN, Circuit Judge.

These appellants were jointly indicted, tried and convicted of misapplication of bank funds under Title 18 U.S.C.A. § 656 and of conspiracy to misapply bank funds.

Miss Nystrom was a teller of the Union National Bank at McKeesport, Pennsylvania; she had been employed by the bank fourteen years. Kennedy was a depositor of the bank. He was in the automobile truck and used car business, sold motor parts and accessories and was a wholesale and retail gasoline dealer.

There were three indictments. No. 13,662 related to fictitious deposit slips. It originally contained twenty-two counts. Of these, Counts Two, Sixteen and Twenty-Two were eliminated by judgments of acquittal being entered on them at the end of the government's case. No. 13,664 dealt with the payment of Kennedy payroll checks from Union Bank funds without Kennedy having sufficient credit balance to cover those payments. Judgment of acquittal was entered on all counts of this indictment after the government had concluded its presentation in chief. The last indictment, No. 13,-665, in five counts charged misapplication of bank funds by honoring Kennedy checks where his account lacked sufficient funds to pay them. The Sixth Count alleged conspiracy to misappropriate bank funds in violation of Section 656 through Kennedy making and issuing checks on his accounts and Miss Nystrom honoring and paying them when the particular accounts did not have sufficient credit balances to pay them. It was also alleged as part of the conspiracy that Miss Nystrom would make deposit slips indicating Kennedy deposits when in fact they had not been made. There were eight overt acts set out as part of the conspiracy, the first four regarding false

deposits and the balance charging payment of checks when there were not sufficient funds for that purpose. Judgment of acquittal was granted on the first five counts of this indictment and that part of Count Six covering the "not sufficient funds" checks together with the related overt acts.

Appellants were convicted on all of the remaining counts. Motions for judgments of acquittal and new trial were thereafter denied.

The theory of the government was that Kennedy had aided and abetted the Union Bank employee, Miss Nystrom, to misapply the bank's funds and that the two of them conspired in the years 1948, 1949 and 1950 to misapply those funds. Their method, as charged, was to make spurious deposit tickets to the Kennedy accounts in order to pad them and so take care of Kennedy's "not sufficient funds" checks or overdrafts in the bank, all with the intent to injure and defraud the bank; finally, contended the government, because of a then pending merger of the Union Bank and the Peoples Bank of McKeesport, with Miss Nystrom knowing of an expected audit of the two banks, she staged or faked a holdup to cover up a shortage of $58,744.

The so-called robbery was alleged to have occurred January 8, 1951 during banking hours. Around two o'clock that afternoon Miss Nystrom reported to her superior, C. E. Anderson, she had been held up at her cage and robbed some fifteen minutes previously. An F.B.I. agent talked with Miss Nystrom that same day about 3:45 p. m. He said she told him that just prior to the holdup she was waiting on three customers at her cage; that there was a line of customers at that cage and that they took their turn as they stepped up to make deposits and transact business; that one of the customers who stepped up in his turn was a man who carried in his left hand a brown canvas bag, a note written on brown wrapping paper and some fifty-dollar bills which he started to push through under the grille work in the teller's cage; that because of this bag she thought that

it was a customer such as other customers who come into the bank for change with which to transact business, so she opened the grille work of the teller's cage. As the man pushed the bag, note and fifty-dollar bills in on the counter in front of her, he said to her, "This is what I want." She picked up the fifty-dollar bills from the top of the note and glanced at the note; that to the best of her recollection it was written on what appeared to be brown wrapping paper and that the words "This is a stick-up" were written on this brown wrapping paper with what appeared to her to be black crayon. She said as soon as she read this note she glanced up and this man had a gun pointed at her which he held in his right hand. He told her, "I want the money in the drawer behind you." She immediately turned and started to put the money in the canvas bag which he had placed on the counter and when she handed the bag to him he said to her not to make a move before 3:00 o'clock because she was being watched. He turned and walked slowly toward the front door of the bank. She said she watched him as he left the teller's cage, then she turned around and glanced back to the line of the customers in front of her and a woman stepped up to the cage. The grille work was still open from the man having been there and the woman stepped up immediately saying, "I will take some of that, too." She carried what Miss Nystrom described as a knitting bag with wooden handles; facing Miss Nystrom she stepped up to the cage holding the bag in her left hand and in her right hand, which she put into the bag, she carried a small gun. Miss Nystrom reached in the teller's drawer to her left and picked up some fifty and one hundred dollar bills and handed them to the woman who then said, "I will take that wallet, too," indicating a wallet lying on the shelf above a work-table behind Miss Nystrom. The latter turned and picked up her wallet, handed it to the woman who dropped it in the knitting bag. The woman made no further remarks to Miss Nystrom and turned and walked toward the front door

of the bank. Both the man and the woman walked slowly and appeared to be in no hurry whatsoever to get out of the bank. At that time Miss Nystrom noticed a man standing near the night depository in the front corner of the bank, and this man appeared to be looking at her but he paid no attention to the two alleged robbers as they walked past. She assumed this man was the person who had been left there to watch her as had been threatened by the alleged male robber who first came to her window.

The agent asked Miss Nystrom about the robber's note. He stated that at first she was unable to recall just what had happened to it. It could not be located in the vicinity of her cage and Miss Nystrom about that time said she recalled that she thought the man had reached in and taken the note back and put it in his pocket.

Miss Nystrom was asked if she could identify any of the bank's customers who immediately preceded or followed the alleged robbers. She was unable to recall any of them either before or after the robbery at any time.

None of the above testimony was denied by Miss Nystrom who was a trial witness.

As a result of the intensive investigation, out of 500 persons interviewed, approximately 60 bank employees and customers were found who were in the bank around the time Miss Nystrom said she had been held up. None of these saw or heard anything unusual and so stated at the trial. Nor was any other evidence discovered in substantial support of the robbery story and no one was located who answered Miss Nystrom's description of the thieves. All this brought about a check of the accounting records of the bank and Kennedy. The irregularities disclosed produced the indictments.

■ Appellants contend there was not sufficient evidence to support their convictions. We must disagree, for on both the substantive and conspiracy counts the government presented a case that en-

titled it to go to the jury and justifies the verdicts of that tribunal.

There was testimony that the practice at the bank in some instances prior to October or November 1949 would be to give back to the teller handling it, and charging it to him, a "not sufficient funds" check if he advised there was a deposit coming in. The person in charge of those checks said, Miss Nystrom, who took care of the Kennedy accounts, got some of that type of Kennedy checks; she did not believe anyone else ever took any of the Kennedy checks. After October or November, 1949, that system was discontinued and only the chief teller could hold NSF checks. There was evidence from bank bookkeepers, employed at various periods between May, 1948 and May, 1952, that Miss Nystrom would call them to ascertain Kennedy's daily balance and which checks were in.

The Kennedy bookkeeper, Langsdorf, as a witness, said that after October 6, 1949, he made out the Kennedy deposit slips and that Kennedy instructed him to draw checks against his accounts even after Langsdorf told him they were overdrawn. He told of Miss Nystrom, while a bank employee, coming to the Kennedy office three and four times a week to assist with the books and overdrafts and that she would often be there in the evening. He stated that Miss Nystrom at times in 1950 would telephone the Kennedy office to tell us "That the account was overdrawn and we needed to put some money in the account." With reference to the deposit slips filled out by Miss Nystrom, he stated he would find the money represented by the slips either in the passbook or the bank statement "or Mr. Kennedy would tell me * * ". He did not recall ever seeing any of that money.

Mrs. Hendrie, Kennedy's secretary, testified that a few times she held up sending out checks to the Atlantic Refining Company within the ten day discount period because there weren't available funds in the accounts or they were over-

drawn. She said she spoke to Kennedy about this and he said "they had to be sent out." Though many times the check book indicated an overdraft, under the instructions of Kennedy or his manager, she continued issuing checks. The witness told of Miss Nystrom directing her attention to an overdraft in the bank on the Kennedy accounts many times in 1948 and 1949 (the last year Mrs. Hendrie was with Kennedy). Part of her job was to reconcile the bank account at the end of the month and there were times when she "couldn't reconcile it." The witness said "there were some times when the bank statement showed more money in the account than I showed in the check book. Now, I would ask Mr. Kennedy about this. If he was around, he would tell me, there were deposits that he had made that he had forgotten to tell us about in the office and when he wasn't around, I sometimes could get the information through Miss Nystrom."

Government accountant Doody investigated Kennedy's income and the bank records. From his adjusted figures Kennedy had an unexplainable source of deposits amounting to $45,364.41.

Counts One through Nine (excluding Two, on which acquittal had been directed) of Indictment No. 13662 covered charges that appellants had misapplied bank funds by preparing deposit slips showing deposits of the stated sums and thus causing them to be wrongfully credited for appellants use when no deposits had been made. The government proof on the first count is typical of the meticulously careful piecing together of evidence to establish the charges of each count in this group. It involves a deposit slip, written by Miss Nystrom and bearing her teller stamp, reflecting a deposit to Kennedy's GMC Truck Company in the sum of $2,100. There was no duplicate slip for this in the regular bookkeeping records of Kennedy's account. The bank ledger sheet showed this deposit posted November 25, 1949. The account passbook had the deposit following an entry of November 29, 1949.

Four checks to the order of the Atlantic Refining Company, totalling $5,101.81 were shown by the bank ledger sheet to have been paid November 25, 1949 and were marked "229.21 NSF". The monthly bank statement of the regular account reflected the $2,100 deposit between November 22 and 25, 1949. Langsdorf, the Kennedy bookkeeper, testified that he found this entry on the bank statement at the end of the month and picked it up in the Cash Received Journal. He also entered it in the check stub book opposite the checks written on November 25th. On his inquiry Kennedy told him it was money invested by him and it was credited to Cash Received. The Kennedy accounts cash sheet showed a deposit of $1,240.39 on November 24 and $631.38 on November 26, 1949. At the beginning of the day on November 25, 1949 the Regular Account bank balance was $229.21. At the close of that same day the account was $10.25 overdrawn. The government accountant testified that immediately prior to the deposit slip of November 25, 1949 showing a deposit of $2,100 to the Kennedy GMC Truck Company Account, Kennedy's account as reflected by his books and records showed an overdraft of $6,413.48. After the deposit was credited to his account, there was an overdraft of $4,313.48.

Counts Ten through Twenty-One (excluding Count Sixteen on which acquittal had been directed) dealt with partially valid deposit slips which had been altered by Miss Nystrom adding fictitious amounts. The government presentation under Count Ten is a fair example of the prosecution evidence introduced to support this group of charges.

Anderson, the assistant cashier of the Union National Bank, identified a deposit slip to Kennedy's GMC Truck Company Special Account, dated September 29, 1949, in the amount of $1,505.66. He stated that it showed on the ledger sheet. He recognized part of the handwriting on the slip, namely "an entry of $1,300.00 added to the deposit slip." He said the figures "$1,300.00" and what was the

new total, "$1,505.66" were in Miss Ny-strom's handwriting. Mrs. Hendrie said that the original $205.66 on the slip was written by her but not the added $1,300 or the new total, $1,505.66. She stated Miss Nystrom told her, Kennedy had deposited $1,300 "that I didn't know about."

It was conceded that the Kennedy bookkeeper would say that the deposit slip was not recorded either as a receipt or as a deposit in the daily cash tape of Kennedy records; that the September 28th tape showed a $205.66 deposit to the Special Account as of September 29th and that the October 5th tape had a receipt by Mrs. Hendrie for $1,300 with the note "This was $1300.00 deposit by S.A.K. (Kennedy) 9–29–49—Recorded by H.L. (Langsdorf)."

There was further agreement that the bookkeeper Langsdorf would testify that the $1,505.66 deposit was not included in the Kennedy duplicate deposit records which however did contain a duplicate for the original amount on the slip of $205.66; that the Cash Receipts Journal showed a receipt of $1,300 as part of a $1,400 entry of September 30, 1949, bearing the notation "Deposit by S.A.K. on 9–29" and credited to Kennedy's personal drawing account; that the Cash Disbursements Journal had the $1,300 and the $205.66 as deposited in the Special Account in September, 1949; that Kennedy's check stub book showed deposits of $205.66 and $1,300 as of September 29, 1949 opposite a September 26th check stub with the $1,300 entry having the notation "by S.A.K. 9/29." It was agreed that Langsdorf would testify that he had no knowledge of the $1,300 deposit until he found it in the September monthly bank statement of the Special Account and that he asked Kennedy about it and was told that it had been "put in by him". Through the bank records it was indicated that two Kennedy checks were paid on September 29, 1949, the first in the amount of $1,528.94 marked "NSF $95.51" and the second for $1,259.05 also marked "NSF $1,236.14".

The government accountant, from Kennedy's books and records, testified that prior to the $1,300 deposit there was an overdraft of $1,719.05 and after the deposit, an overdraft of $419.05. From the bank records, the accountant said that before the deposit there was an overdraft of $1,204.55 and afterward a balance of $95.45. Counsel stipulated that the Kennedy bookkeeper would testify that when the deposit of $1,300 was entered, the Kennedy records showed that the Special Account was overdrawn approximately $3,100.

The balance of the government case had to do with the charge that appellants had conspired to make fictitious deposit slips reflecting deposits to Kennedy's accounts. The evidence introduced was very similar to that presented in the fictitious deposit tickets substantive counts, supra. Once more there was carefully documented testimony indicating, if believed, that appellants had entered into a scheme to make false deposit tickets with the end result to wrongfully credit Kennedy's accounts with the amounts set out on those slips and so defraud the bank. Four overt acts were substantially proved.

In the course of the government evidence regarding the second of the overt acts which concerned a deposit slip dated February 4, 1948 written by Miss Nystrom and crediting Kennedy's regular account with $1,300, Mrs. Hendrie testified that she made an original and duplicate slip with the notation "Kennedy's GMC Truck Company, February 4, 1948, $1300.00 put in by H.N. (Hildur Nystrom) reimbursed from Menzie check $1876.45 on February 5, 1948." On cross-examination Mrs. Hendrie stated that she had told Kennedy about reimbursing Miss Nystrom for the $1,300 and in talking of the bad condition of the check book said to him, "*You will note the deposits, I have been having to pay Miss Nystrom back because she has been putting in money for us.*" Mrs. Hendrie stated Kennedy acted surprised and answered, "*She shouldn't have to do that, Dolores, with the large Accounts Receiv-*

*able we have outstanding."* (Emphasis supplied.)

The government, out of a seemingly tortuous maze, produced clear proof of Kennedy, despite his knowledge that his accounts were overdrawn, having his employees issue checks thereon; of no duplicate deposit slips in his records and picking up the deposits at the end of the month from the bank statement as coming from him; of Miss Nystrom in the Kennedy office three and four times a week, including nights, working on the books and overdrafts; of her keeping in touch with the bank bookkeepers regarding the Kennedy balance and checks; of her calls to the Kennedy office about needed deposits and she herself making them; of the Kennedy deposit tickets and alterations to them in her handwriting; of irregular entries in the Kennedy bankbook in her handwriting; of the overdrafts at the time of each fictitious deposit in the indictments; of substantial sums of Kennedy's deposits during the critical years for which there was no explainable source; of the astounding story by Miss Nystrom of a robbery which accounted for a shortage of $58,-744.58 just at the time when auditors were due because of the pending banks' merger.

It is true that the government evidence was largely circumstantial. As to it the court charged:

"So, to review as to circumstantial evidence; In order to justify a conviction for a crime on the basis of circumstantial evidence it is necessary that the directly proven circumstances be established by the Government beyond a reasonable doubt, and be such as to exclude every reasonable hypothesis except that of guilt before a verdict of guilty could be returned. If the circumstances do not exclude every reasonable hypothesis of innocence, it is the duty of the jury to acquit and return a verdict of 'not guilty.'"

The government had and has no complaint with this statement,[1] saying that the array of circumstantial evidence was manifestly ample to preclude every reasonable hypothesis but that of defendants' guilt so that the case was rightfully submitted to the jury. Examination of the record in this long dreary proceeding reveals that, even under the above stringent rule, fact questions were presented; further that appellants' claim that the government proof consisted of the unauthorized pyramiding of one inference upon another is unjustified. Despite difficult circumstances there was developed in the course of the trial strong evidence which bore out the charge that Miss Nystrom and Kennedy conspired to and did misapply Union National Bank funds by making fictitious deposit slips in whole or part in the Kennedy accounts in order to ostensibly increase the latter and so take care of the Kennedy "not sufficient funds" checks and overdrafts.

The defense contended there was no misapplication of bank funds or conspiracy to do so; that it was the bank's policy to pay NSF Kennedy checks; that the deposit slips were not fictitious but represented personal deposits by Kennedy for which he subsequently reimbursed himself by deducting the amounts from later deposit slips to his business accounts or by drawing a check to himself against those accounts. The jury had that evidence before it and from its decision declined to accept it. That decision was peculiarly for the fact finding body. We have no right to disturb it.

The related question of the credibility of the government witnesses, notably Mrs. Hendrie and the accountant, was

---

1. Compare the language of the Supreme Court with reference to circumstantial evidence in Holland v. United States, 1954, 348 U.S. 121, 139–140, 75 S.Ct. 127, 99 L.Ed. 150. It should be noted that this trial concluded August 19, 1953, more than a year prior to the Holland opinion which was filed December 6, 1954.

also for the jury, under the charge of the court.

Appellants argue that Kennedy's admission that Miss Nystrom made deposits for him is not enough to sustain a conviction for conspiracy unless the corroborative evidence be of the corpus delicti. The correct principle is laid down in Opper v. United States, 1954, 348 U.S. 84, 93, 75 S.Ct. 158, 164, 99 L.Ed. 101, where the Supreme Court stated that " * * * we think the better rule to be that the corroborative evidence need not be sufficient, independent of the statements, to establish the corpus delicti." In conformity with that rule there was ample corroboration of the Kennedy admission in other testimony by the same witness. In addition, the admission was not the sole evidence pointing to a conspiracy. It was merely one of the circumstances from which the jury could conclude that a conspiracy existed.

Though, as might be supposed, there was no direct proof of intent to defraud the bank, that element of the crimes charged could have been readily and properly inferred from the evidence. Savitt v. United States, 3 Cir., 1932, 59 F.2d 541; Brock v. United States, 3 Cir., 1906, 149 F. 173.

The contention that there was no loss by the bank is without merit for, as is urged by the government, at least temporary losses resulted from the misapplication of bank funds through the payment of NSF Kennedy checks in each of the fictitious deposits on which the indictments were founded.

Appellants also argue certain alleged errors of the district judge. The first of these is his refusal to declare a mistrial because of the defense assertion that the government accountant and a juror had winked at each other. The judge investigated this and concluded that no untoward incident had occurred which could have substantially prejudiced appellants. His decision was well within his discretion.

Complaint is made of the admission into evidence of proofs relating to Counts Two, Sixteen and Twenty-Two of Indictment No. 13662; all of the counts of No. 13664; in No. 13665, of Counts One through Five and the NSF checks part of Six (those charges, it will be remembered, eventually went out of the trial by judgments of acquittal). It is argued that this was prejudicial to appellants and therefore their motion for a mistrial at the end of the government's case should have been allowed.

Appellants had specifically agreed to the trial of the three indictments together. The trial covered a period from April 14, 1953 to August 19, 1953. The trial court was completely satisfied of the good faith of the government in pressing all counts of the three indictments. The judgments of acquittal were immediately caused by the court's refusal to permit the government to call as a witness the ill president of the Union Bank. The government had expected to show by him that there was no bank policy to pay all of Kennedy's "insufficient funds" checks. The trial judge explicitly instructed the jury, at the time of entering the judgments of acquittal and in the charge itself, to cast from their minds all evidence relating to the stricken counts. Clearly the denial of the motion was a matter of judicial trial discretion and without error. Cf. Logan v. United States, 1892, 144 U.S. 263, 296–297, 12 S.Ct. 617, 36 L.Ed. 429.

Appellants suggest that the trial judge erred in permitting the government accountant to state the amount of Kennedy's unexplained cash sources for deposit. It is said the government should have been forced to show that each alleged deposit was falsified by proving that at the time or immediately prior to the date of a particular deposit ticket Kennedy did not have sufficient funds available to make the deposit.

The government did prove the difference (including trial corrections) between the total deposits for which the

accountant did not know the source of Kennedy's cash and the cash available to Kennedy as the amount of the unexplainable source of deposits. The information as to Kennedy's cash and income apart from his business came from Kennedy himself with other sources coming in during the trial. There is no valid contradiction of the government's contention that it fully developed and revealed at the trial all information made available to it regarding Kennedy's cash which could have been used for deposits. The method of proof employed, summarization of records covering Kennedy's cash resources during the three pertinent years, is not unlike the net worth proof sanctioned in Costello v. United States, 1956, 350 U.S. 359, 76 S.Ct. 406; Holland v. United States, 1954, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150; Smith v. United States, 1954, 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192; United States v. Calderon, 1954, 348 U.S. 160, 75 S.Ct. 186, 99 L.Ed. 202; United States v. Johnson, 1943, 319 U.S. 503, 63 S.Ct. 1233, 87 L.Ed. 1546. As was said in the Costello decision, supra, 350 U.S. at page 360, 76 S.Ct. at page 407: "They were allowed to summarize the vast amount of evidence already heard and to introduce computations showing, if correct, that petitioner and his wife had received far greater income than they had reported. We have held such summarizations admissible in a 'net worth' case like this. United States v. Johnson, 319 U.S. 503, 63 S.Ct. 1233, 87 L.Ed. 1546." In Holland, supra, 348 U.S. at page 138, 75 S.Ct. at page 137, it was held: "But where relevant leads are not forthcoming, the Government is not required to negate every possible source of nontaxable income, a matter peculiarly within the knowledge of the defendant. See Rossi v. United States, 289 U.S. 89, 91–92, 53 S.Ct. 532, 533, 77 L.Ed. 1051.

Nor does this rule shift the burden of proof. The Government must still prove every element of the offense beyond a reasonable doubt though not to a mathematical certainty."

Under that analogous law it seems to us that the district judge rightfully allowed the testimony and that the government at no time attempted to shift the burden of proof, which it admittedly had, over to the appellants.

Appellants' last point is that the trial court erred in allowing government cross-examination of Miss Nystrom on the Union Bank accounts of Jenny Reed and Ruth H. Derr. That questioning was for the purpose of indicating the availability of certain funds during particular periods to Miss Nystrom to cover shortages in her accounts. In the trial court's opinion the evidence failed to sustain this and the offered supporting bank record exhibits were not allowed in evidence. The government there dropped the endeavor. While the court did not allude to this incident specially in its charge it did say generally that the jury was to disregard any stricken evidence and testimony to which objection had been sustained. We seriously doubt that there was any error by the trial court in connection with the outlined situation. If there was, it was minor and of no serious prejudice to appellants.

Notwithstanding the length of both over-all and actual trial time of this case and its complicated voluminous proof, it is free from major error. These appellants had a fair trial. The issues remaining, after judgments of acquittal on certain of the charges, called for jury decision.

The judgments of conviction will be affirmed.